John F. BANZHAF, III, Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION

and

United States of America,
Respondents,

WTRF–TV, Inc. and National Association
of Broadcasters, American Broadcasting Companies, Inc., the Tobacco Institute, Inc., the American Tobacco Company, Brown & Williamson Tobacco
Corp., Larus & Brother Co., Inc., Liggett & Myers Tobacco Co., Philip Morris, Inc., R. J. Reynolds Tobacco Co.,
United States Tobacco Co., P. Lorillard
Co., Intervenors.

WTRF–TV, INC. and National Association of Broadcasters, Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION

and

United States of America,
Respondents,

Heart Disease Research Foundation et al.,
Intervenors.

The TOBACCO INSTITUTE, INCORPORATED, et al., Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION

and

United States of America,
Respondents.

Nos. 21285, 21525, 21526, 21577.

United States Court of Appeals
District of Columbia Circuit.

Argued June 25, 1968.

Decided Nov. 21, 1968.

Mr. John F. Banzhaf, III, petitioner pro se, and Mr. Earle K. Moore, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, for petitioner in No. 21,285 and intervenor in Nos. 21525–6.

Mr. Howard C. Westwood, Washington, D. C., with whom Messrs. Ernest W. Jennes, Herbert Dym, Jonathan D. Blake and Richard S. Morey, Washington, D. C., were on the brief for petitioners in Nos. 21525–6. Mr. Jerome Ackerman, Washington, D. C., also entered an appearance for petitioners in Nos. 21525–6.

Mr. Abe Krash, Washington, D. C., with whom Messrs. Paul A. Porter, Daniel A. Rezneck and Jerome I. Chapman, Washington, D. C., were on the brief for The Tobacco Institute, Inc. and Philip Morris, Inc., argued for all petitioners in No. 21,577. Mr. Porter R. Chandler, New York City, was on the brief for R. J. Reynolds Tobacco Co., petitioner in No. 21,577.

Mr. Eugene R. Anderson, New York City, was on the brief for The American Tobacco Company, petitioner in No. 21,577.

Mr. Carleton A. Harkrader, Washington, D. C., was on the brief for P. Lorillard Co., petitioner in No. 21,577.

Mr. John H. Conlin, Associate General Counsel, Federal Communications Commission, with whom Asst. Atty. Gen. Donald F. Turner, Messrs. Henry Geller, General Counsel, Stuart F. Feldstein, William L. Fishman and Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, were on the brief for respondents. Messrs. Robert D. Hadl, Attorney, Federal Communications Commission, and Howard E. Shapiro, Attorney, Department of Justice, also entered appearances for respondents.

Messrs. Lloyd N. Cutler, J. Roger Wollenberg, Timothy B. Dyk, Daniel Marcus and Robert A. Warden, Washington, D. C., were on the brief for Columbia Broadcasting System, Inc., intervenor in Nos. 21,525 and 21,526.

Messrs. Donald J. Mulvihill and Howard Monderer, Washington, D. C., were on the brief for National Broadcasting Company, Inc., intervenor in Nos. 21,525 and 21,526.

Mr. Lloyd Symington, Washington, D. C., filed a brief on behalf of The National Tuberculosis Association as amicus curiae urging affirmance.

Messrs. Abe Krash, Paul A. Porter, Daniel A. Rezneck and Jerome I. Chapman, Washington, D. C., also entered appearances for The Tobacco Institute, Inc., American Tobacco Co., Brown & Williamson Tobacco Corp., Larus & Brother Co., Inc., Liggett & Myers Tobacco Co., Philip Morris, Inc., R. J. Reynolds Tobacco Co., United States Tobacco Co. and P. Lorillard Co., intervenors in Nos. 21,285, 21,525 and 21,526.

Messrs. James A. McKenna, Jr. and Vernon L. Wilkinson, Washington, D. C., entered appearances for American Broadcasting Companies, Inc., intervenor in Nos. 21,525 and 21,526.

Mr. Edgar F. Czarra, Jr., Washington, D. C., entered an appearance for WTRF-TV, Inc. and National Association of Broadcasters, intervenors in No. 21,285, and Spartan Radiocasting, Palmetto Radio, W. A. V. E., Inc., WFIE, Inc. and WFRV, Inc. and Indiana Broadcasting, Gulf Television Corporation, Corinthian Television Corporation and Great Western Broadcasting Corp., intervenors in Nos. 21,525 and 21,526.

Messrs. Vincent A. Pepper and Arthur V. Weinberg, Washington, D. C., entered appearances for WLLE, Inc., intervenor in Nos. 21,525 and 21,526.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and WRIGHT, Circuit Judge.

BAZELON, Chief Judge:

In these appeals we affirm a ruling of the Federal Communications Commission requiring radio and television stations which carry cigarette advertising to devote a significant amount of broadcast time to presenting the case against cigarette smoking. This holding rests on negative answers to the following principal questions:

(I) whether in the Cigarette Labeling Act of 1965 Congress preempted the field of regulation addressed to the health problem posed by cigarette smoking so as to deny the FCC any authority it otherwise had to issue its cigarette ruling (infra, pp. 1087–1091);

(II) if not so forbidden, whether the ruling is nonetheless unauthorized (infra, pp. 1091–1099), either

(A) because the Commission has no authority to regulate broadcast content (infra, pp. 1093–1096), or

(B) because any authority over program content which the Commission may have cannot support a ruling of this kind (infra. pp. 1096–1099); and

(III) if neither forbidden nor unauthorized, whether the ruling is unconstitutional (infra, pp. 1099–1103), either

(A) because the First Amendment permits no regulation of program content (infra, pp. 1099–1101), or

(B) because the cigarette ruling in particular violates the First Amendment (infra, pp. 1101–1103).

The history of the cigarette ruling dates to December 1966, when citizen John F. Banzhaf, III asked WCBS–TV to provide free time in which anti-smokers might respond to the pro-smoking views he said were implicit in the cigarette commercials it broadcast.[1] Although he cited several specific commercial messages, Banzhaf's target included

> all cigarette advertisements which by their portrayals of youthful or virile-looking or sophisticated persons enjoying cigarettes in interesting and exciting situations deliberately seek to create the impression and present the point of view that smoking is socially acceptable and desirable, manly, and a necessary part of a rich full life.

He said this point of view raised one side of a "controversial issue of public importance" and concluded that under the FCC's fairness doctrine, WCBS was under obligation to "affirmatively endeavor to make [its] * * * facilities available for the expression of contrasting viewpoints held by responsible elements. * * *"

WCBS replied that it had broadcast several news and information programs presenting the facts about the smoking-health controversy, as well as five public service announcements of the American Cancer Society aired free of charge during recent months.[2] On the basis of these broadcasts it was confident that "its coverage of the health ramifications of smoking has been fully consistent with the fairness doctrine." But it doubted in any event that "the fairness doctrine can properly be applied to commercial announcements solely and clearly aimed at selling products and services. * * *"

Thereupon, Banzhaf forwarded the correspondence to the Federal Communications Commission under cover of a complaint that the station was violating the fairness doctrine.[3] And thereby hangs the following legal tale.

The Commission sustained the Banzhaf complaint. In a letter dated June 2, 1967,[4] it agreed that the cited cigarette commercials "present the point of view that smoking is 'socially acceptable and desirable, manly, and a necessary part of a rich full life,' "[5] and, as such, invoke the fairness doctrine. It said in part:

> We stress that our holding is limited to this product—cigarettes. Governmental and private reports (e. g., the 1964 Report of the Surgeon General's Committee) and congressional action (e. g., the Federal Cigarette Labeling and Advertising Act of 1965) assert that normal use of this product can be a hazard to the health of millions of persons. The advertisements in question clearly promote the use of a particular cigarette as attractive and enjoyable. Indeed, they understandably have no other purpose. We believe that a station which presents such advertisements has the duty of informing its audience of the other side of this controversial issue of public importance—that, however enjoyable, such smoking may be a hazard to the smoker's health.[6]

The Commission refused, however, to require "equal time" for the anti-smoking position and emphasized that "the type of programming and the amount and nature of time to be afforded is a matter for the good faith, reasonable

---

1. Letter from John F. Banzhaf, III to Television Station WCBS-TV, December 1, 1966.

2. Letter from Clark S. George, Vice-President and General Manager, WCBS-TV to John F. Banzhaf, III, December 30, 1966.

3. Letter from John F. Banzhaf, III, to Federal Communications Commission, January 5, 1967.

4. Television Station WCBS-TV, 8 F.C.C. 2d 381 (1967).

5. *Id.*

6. *Id.* at 381–382.

judgment of the licensee. * * *" But it directed stations which carry cigarette commercials to provide "a significant amount of time for the other viewpoint. * * *" And by way of illustration it suggested they might discharge their responsibilities by presenting "each week * * * a number of the public-service announcements of the American Cancer Society or HEW in this field." [7]

In response to numerous petitions and requests for reconsideration, the Commission affirmed its ruling in a lengthy Memorandum Opinion.[8] It rejected contentions that the fairness doctrine is unconstitutional and that the cigarette ruling is precluded by the Cigarette Labeling and Advertising Act of 1965. The opinion did make clear that cigarette advertising *in general,* not any particular commercials, necessarily conveys the controversial view that smoking is a good thing.[9] But the Commission stressed again that its ruling was "limited to this product—cigarettes" and disclaimed any intention "to imply that any appeal to the Commission by a vocal minority will suffice to classify advertising of a product as controversial and of public importance." [10]

While defending its failure to provide interested persons an opportunity to be heard before issuing its ruling, the Commission emphasized that any procedural lapse was cured by its exhaustive consideration of the many petitions for re-

view. Finally, it concluded that, "the specifics of the Fairness Doctrine" aside, its ruling was required by the public interest.[11]

Subsequently, in response to a request for clarification, the Commission ruled that stations which carry cigarette advertising are under no obligation to provide the cigarette companies free time in which to respond to broadcast claims that smoking endangers health.[12]

In this review proceeding, the Commission is challenged at virtually every point. Mr. Banzhaf complains that the anti-smoking forces should have been granted equal time. Petitioners Station WTRF–TV, the National Association of Broadcasters, The Tobacco Institute, and eight cigarette manufacturers (hereinafter "petitioners"), all of whose appeals have been consolidated, complain of almost everything else. They are supported by Intervenors CBS and NBC–ABC–WLLE Inc. The Commission is supported by the interventions of the American Tuberculosis Association and the ubiquitous Mr. Banzhaf.

We turn now to the issues these legal armies present for our consideration.

I. THE CIGARETTE LABELING ACT

■ We are confronted at the outset by the contention that the Commission's action is precluded by the Federal Cigarette Labeling and Advertising Act of 1965.[13] That Act requires cigarette manufacturers and importers to print on

7. *Id.* at 382. The Commission noted WCBS's public service programming in this area, see text at note 2 *supra,* but said "the question remains whether in the circumstances a sufficient amount of time is being allocated each week to cover the viewpoint of the health hazard posed by smoking." *Id.* at 383.

8. Television Station WCBS-TV ("Applicability of the Fairness Doctrine to Cigarette Advertising"), 9 F.C.C.2d 921 (1967), hereinafter cited as "Cigarette Advertising."

9. The Commission explained that it could make its ruling without having before it the text of the particular commercials cited in Banzhaf's complaint, because the controversial issue was not whether smok-

ing is dangerous to health but whether it is desirable. *Id.* at 946 n. 30. *And see id.* at 939. The Commission said it had been cited to "no example of a cigarette commercial that does not portray the use of the particular cigarette as attractive and enjoyable as well as encourage people to smoke," and found it "difficult to conceive of one [which would not do so]." *Id.* at 938.

10. *Id.* at 943.

11. *Id.* at 949.

12. Applicability of the Fairness Doctrine to Cigarette Advertising, 10 F.C.C.2d 16 (1967).

13. 79 Stat. 282 (1965), 15 U.S.C. §§ 1331–39 (Supp.1966).

each pack the warning "Caution: Cigarette Smoking May Be Hazardous to Your Health" and provides that

> no statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.[14]

Since the Commission's ruling does not require the inclusion of any "statement * * * in the advertising of any cigarettes," but rather directs stations which advertise cigarettes to present "the other side" each week, it does not violate the letter of the Act.

But petitioners contend that, though Congress said only "no statement shall be required * * * in * * * advertising," it meant to forbid any regulation addressed to the smoking-health problem except the Federal Trade Commission's specifically exempted power to police false and misleading advertising.[15] In support of this proposition, they refer us primarily to the Act's Declaration of Policy, in which Congress asserts a purpose to

> establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—(1) the public may be adequately informed that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes; and
>
> (2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.[16]

From this declaration and from assorted snippets of legislative history, they conclude that Congress has definitively balanced the conflicting interests of the health of the public and the health of the economy and determined—in effect as a matter of law—that the public will be "adequately informed" on the smoking-and-health issue until July, 1969,[17] without any further governmental requirements.

The Commission, on the other hand, thought its ruling implemented a congressional policy of promoting intensive smoker-education during the life of the Act as an alternative to the "drastic step" of requiring warnings in every cigarette advertisement. Its opinion cites the express reliance in both House and Senate Reports on the anti-smoking campaigns of public and private groups as a reason for deferring stronger Congressional action.[18] And it notes that Congress itself appropriated $2 million to fund the extensive informational activities in this

---

14. Federal Cigarette Labeling and Advertising Act of 1965 (hereinafter "Act") § 5(b), 15 U.S.C. § 1334(b) (Supp.1966).

15. Section 5(c) of the Act states:
Except as is otherwise provided * * *, nothing in this Act shall be construed to limit, restrict, expand, or otherwise affect, the authority of the Federal Trade Commission with respect to unfair or deceptive acts or practices in the advertising of cigarettes * * *.
15 U.S.C. § 1334(c) (Supp.1966).

16. Act, § 2, 15 U.S.C. § 1331 (Supp.1966).

17. Section 10 of the Act provides that the provisions "which affect the regulation of advertising" shall terminate on July 1, 1969. 15 U.S.C. § 1339 (Supp.1966).

18. The Senate Commerce Committee concluded:

> Considering the combined impact of voluntary limitations on advertising under the Cigarette Advertising Code, the extensive smoking education campaigns now underway, and the compulsory warning on the package which will be required under the provisions of this bill, it was the Committee's unanimous judgment that no warning in cigarette advertising should be required pending the showing that these vigorous, but less drastic, steps have not adequately alerted the public to the potential hazard from smoking.

S.Rep.No. 195, 89th Cong., 1st Sess., p. 5 (1965). *See also* H.R.Rep.No. 449, 89th Cong., 1st Sess. pp. 4–5 (1965), U.S.Code Congressional and Administrative News, p. 2350.

area of the Department of Health, Education and Welfare.[19]

This evidence does not establish unequivocally that Congress did not intend to rely exclusively on such non-coercive educational efforts to inform the public. Congress expressed no purpose in the Act of informing the public of anything except the bare fact that "cigarette smoking may be hazardous to health." Its prescribed warnings do that much and no more. They merely flash danger signals without either particularizing the danger or providing facts on which it may be appraised.

But the anti-smoking campaigns are scarcely so pervasive or so well-funded that additional information could be regarded as mere surfeit. Accordingly, if we are to adopt petitioners' analysis, we must conclude that Congress legislated to curtail the potential flow of information lest the public learn too much about the hazards of smoking for the good of the tobacco industry and the economy. We are loathe to impute such a purpose to Congress absent a clear expression. Where a controversial issue with potentially grave consequences is left to each individual to decide for himself, the need for an abundant and ready supply of relevant information is too obvious to need belaboring.

■ In the present case we find no such clear expression of restrictive intent. On the contrary, there are positive indications that Congress's "comprehensive program" was directed at the relatively narrow specific issue of regulation of "cigarette labeling and advertising." The Act was in fact passed in response to a pending Federal Trade Commission rule which would have required warnings both on packages and in all advertising.[20] Subjected to competing pressures and uncertain of the full extent of the health hazard, Congress apparently settled on half of the FTC's proposed loaf, shelved the other half for four years,[21] and expressly disclaimed any intent to affect other FTC policies or powers.[22] (Nothing in the Act indicates that Congress had any intent at all with respect to other types of regulation by other agencies— much less that it specifically meant to foreclose all such regulation.[23]) If it meant to do anything so dramatic, it might reasonably be expected to have said so directly—especially where it was careful to include a section entitled "Preemption" specifically forbidding designated types of regulatory action.[24]

19. Cigarette Advertising, *supra* note 8, at 933.

20. On June 22, 1964, the Federal Trade Commission promulgated a proposed regulation requiring warnings on cigarette packs from January 1, 1965, and warnings in advertising as well from July 1, 1965, unless the package warnings and voluntary advertising reforms had changed the circumstances by then. 29 Fed.Reg. 8325 (1964). The next day the House Commerce Committee began hearings on various cigarette legislation which had been introduced in the House during the 88th Congress. Those hearings and that Congress adjourned without action, but the FTC acceded to the request of Chairman Harris to postpone the effective date of the package-warning rule to July 1, 1965, so that the new Congress might legislate. 29 Fed.Reg. 15570 (1964). The 89th Congress rushed into the breach with the Cigarette Labeling Act, and as a result the FTC rule was stillborn.

21. See Act, § 5(b), text at note 14, *supra;* § 10, *supra* note 17.

22. Act, § 5(c), *supra* note 15.

23. The only reference to other agencies besides the FTC in the entire Act is the declaration in Section 10 that the termination in 1969 of the provisions affecting the regulation of advertising "shall not be construed as limiting, expanding, or otherwise affecting the jurisdiction or authority which the Federal Trade Commission or any other Federal agency had prior to the date of the enactment of this Act." 15 U.S.C. § 1339 (Supp.1966). Since all other agencies are necessarily included in the blanket ban on required warnings in advertising, this negative provision is not evidence that the Act sweeps more broadly than its words import.

24. Act, § 5, 15 U.S.C. § 1334 (Supp.1966).

In short, we think the Cigarette Labeling Act represents the balance drawn between the narrow purpose of warning the public "that cigarette smoking may be hazardous to health" and the interests of the economy. In that reckoning, the question of the public's need for information about the nature, extent, and certainty of the danger was left out of the scales, and so is left unaffected, except incidentally, by the result. Congress may reasonably have concluded that a warning on each pack was adequate *warning*.[25] It surely did not think the warnings were themselves adequate *information*. And we find no sufficiently persuasive evidence that Congress hoped to impede the flow of adequate information for fear that, if the public knew all the facts, too many of them would stop smoking.[26]

This relatively narrow reading of the Act is not in conflict with its declared objective of protecting commerce and the national economy against "diverse, non-uniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health."[27] Congress patently did not want cigarette manufacturers harassed by conflicting affirmative requirements with respect to the content of their advertising. In addition, it evidently decided that the case against smoking was not yet so overwhelming as to warrant compelling the cigarette companies to dig their own graves by neutralizing their

25. Too many bare warnings might result in an uninformed and possibly unnecessary stampede away from cigarettes. While we will not assume that Congress wished to protect the economy at the expense of life and health, it clearly did wish to protect it to the maximum extent compatible with intelligent individual decisions on the health issue. Congress gave the benefit of every doubt to the possibility that the benefits of smoking might outweigh the potential danger to health; but that is not to say that it wished to conceal from the public the true extent of the danger. It is true that the anti-cigarette broadcasts required by the Commission's ruling may include uninformative propaganda as well as hard information. That possibility is a necessary consequence of the Commission's proper reluctance to dictate the content of broadcast material. See Part II, *infra*. But the ruling is reasonably designed to promote the diffusion of information; it is plainly not the substantial equivalent of the required "warnings" in advertisement which Congress has prohibited.

26. Apart from the declaration of policy to establish a "comprehensive" program—which is meaningful only after we discover what subject matter is comprehended—petitioners rely primarily on the broad scope of the congressional hearings from which the Act emerged. The Senate Commerce Committee heard wide-ranging testimony on all aspects of the smoking-health controversy, including the views of the FCC. Congress also considered proposals for more drastic congressional action than that taken by the Act. But the fact that Congress considered and declined to adopt broader legislation does not establish that it intended to bar otherwise-authorized agency action under established powers and duties.

Petitioners also make much of the fact that the FCC, through its Chairman, specifically told Congress that it had no present plans for regulatory action addressed to the smoking-health problem and that it preferred the across-the-board approach taken by the FTC. While it is possible that had the FCC then anticipated its cigarette ruling, Congress would have expressly prohibited it, that possibility must remain in the realm of speculation. We must decide questions of legislative intent by the lights we have, not by those we might have had.

Nor do we think the FCC's 1964 disclaimer of intent to deal with the cigarette problem deprives it of authority it would otherwise have had to do so now. It is not suggested that the FCC acted in bad faith. The 1964 statement came at a time when the FTC was conspicuously taking the lead oar in attacking the problem on a media-wide front. The FCC may well have been reluctant in those circumstances to place a special burden on the communications industry. Primarily because of the Cigarette Labeling Act, the FTC's broad attack is now stalled. *Supra*, note 20. If the Act itself does not preempt FCC regulation, we see no reason why the FCC may not take the effects of the Act into account in assessing the need for its own action.

27. Act, § 2, text at note 16, *supra*.

own advertising messages.[28] Even if these policies implicitly preempt regulations *of advertising* substantially equivalent to the FTC's proposed required warnings,[29] they do not exclude a single, uniform regulation *of broadcasters* designed to inform the public.

## II. THE COMMISSION'S AUTHORITY UNDER THE PUBLIC INTEREST STANDARD OF THE COMMUNICATIONS ACT.

A fundamental question, of course, is whether the Commission's ruling, though not expressly forbidden by statute, is within the scope of its delegated authority. The ruling originated in response to a "fairness doctrine" complaint and held that the fairness doctrine applied to cigarette advertising. But in its opinion affirming the ruling, the Commission also asserted that it "clearly has the authority to make this public interest rul-

ing" under the public interest standard of the Communications Act and relied upon "the licensee's statutory obligation to operate in the public interest." [30]

Last year in Red Lion Broadcasting Co. v. FCC,[31] we upheld the fairness doctrine in the face of arguments that it was unauthorized and unconstitutional. Since then, in Radio Television News Directors v. FCC,[32] the Seventh Circuit has held that the Commission's personal attack rules violate the First Amendment and, in so doing, has cast some doubt on the constitutionality of the underlying fairness doctrine.[33] These issues are now to be resolved by the Supreme Court.

In part for this reason, we do not think protracted discussion of the fairness doctrine will materially advance our inquiry. It is clear to us that, even if incorporated into the fairness doctrine, the ruling before us is to all intents a novel applica-

28. In the Congressional hearings on proposed cigarette legislation, tobacco industry spokesmen appeared to view the FTC's rule requiring them to include warnings in their advertising as uniquely obnoxious. One of them, for example, told the House Commerce Committee that
the insistence upon a warning in advertising, in addition to the demand for a warning on labels, is punitive in nature. The right to advertise—an essential commercial right—is virtually destroyed if a manufacturer is required in every advertisement to disparage the product.
Hearings before the House Committee on Interstate and Foreign Commerce, 89th Cong., 1st Sess., p. 284 (1964).

29. The Commission thought the Act implicitly forbade a requirement that stations present warning statements immediately "adjacent" to each cigarette commercial. We need not decide whether such a requirement, though not a regulation of *advertising*, is so nearly identical to such a regulation in purpose and effect as to fall within the statute's prohibition.

30. Cigarette Advertising, *supra* note 8, 9 F.C.C.2d at 927.

31. 127 U.S.App.D.C. 129, 381 F.2d 908, cert. granted, 389 U.S. 968, 88 S.Ct. 470, 19 L.Ed.2d 458 (1967), argument postponed pending decision of the Seventh Circuit in Radio Television News Directors Ass'n v. United States (*infra* note

32), 390 U.S. 916, 88 S.Ct. 857, 19 L.Ed. 2d 982 (1968).

32. 400 F.2d 1002 (7 Cir., decided September 10, 1968).

33. The Court of Appeals distinguished the personal attack rules from the underlying fairness doctrine on two grounds. First, the rules represent an unusual particularization of the doctrine, since they impose detailed tests for determining which individual broadcasts trigger the stations' duty to provide reply time and since, unlike the cigarette ruling, they also leave the stations little discretion as to how that duty may be fulfilled. Second, the personal attack rules are enforceable by penalties for individual infractions rather than solely by consideration of a station's overall performance in the proceedings for renewal of a license. Radio Television News Directors Ass'n v. United States (FCC), *supra* note 32 (400 F.2d pp. 1013–1014). Nonetheless, the court expressly refused to decide the constitutionality of the fairness doctrine itself. *Id.*, 400 F. 2d 1017. It did decide that the objective of a fair and balanced presentation of issues of public importance does not justify rules which are likely to inhibit public debate on political issues and might, by their vagueness, set up the Commission as a de facto censor of individual editorial and political broadcasts. This holding cuts very near the heart of the fairness doctrine. See Editorializing by Broadcast Licensees, 13 F.C.C. 1246 (1949).

tion. In only one instance has the Commission previously held the advertising of a consumer product subject to the rule that broadcasters' presentations of controversial public issues must be fair and balanced.[34] The narrow issue presented by the facts of that case was whether a station in the temperance belt which advertised alcoholic beverages could, consistently with the principles now known as the fairness doctrine, refuse to accept anti-liquor advertising from temperance groups.[35] The case has not been followed in the twenty years since it was decided. It is not in any event a clear precedent for a ruling which instructs stations to broadcast opposition to their paid commercials regardless of whether opponents buy—or even request—such broadcast time. In addition, except for the personal attack rules struck down by the Seventh Circuit,[36] we know of no case in which the Commission has so specifically defined the stations' duties under the fairness doctrine.[37]

We also note that elsewhere the Commission has been hesitant to invoke the fairness doctrine where a controversial issue is raised only by implication.[38] Finally, the Commission itself concluded that its main point would be lost if the legal debate concentrated too intensely on the "specifics of the fairness doctrine." [39]

None of the novel aspects of the ruling, of course, precludes an extension of the fairness doctrine at this time. But the extension must, like the doctrine itself, find its authority in the public interest standard. Thus, whether the ruling is viewed as a new application of the fairness doctrine or as an independent public interest ruling, the ultimate question is the same. Moreover, in view of the constitutional attack on the doctrine, the specific question of greatest long-term importance may be whether the cigarette ruling can stand on its own feet.

In fact, we think the best statement of the Commission's holding and rationale is contained in the summary paragraph introducing the "Conclusions" section of its opinion:

There is, we believe, some tendency to miss the main point at issue by concentration on labels such as the specifics of the Fairness Doctrine or by conjuring up a parade of "horrible" extensions of the ruling. The ruling is really a simple and practical one, required by the public interest. The licensee, who has a duty "to operate in the public interest" * * * is presenting commercials urging the consumption of a product whose normal use has been found by the Congress and the Government to represent a

34. Petition of Sam Morris, 11 F.C.C. 197 (1946). This opinion in fact predates the first formal articulation of the policies now known as the "fairness doctrine" in the 1949 Report of the Commission in the Matter of Editorializing by Broadcast Licensees, *supra* note 33. But the basic requirement of fair and balanced presentation of controversial issues of public importance dates from decisions of the old Radio Commission and from the early rulings of the FCC. See Red Lion Broadcasting v. FCC, *supra* note 31, 127 U.S. App.D.C. at 138–139, 381 F.2d at 917–918, and cases cited therein.

35. The Commission observed, "[I]t can at least be said that the advertising of alcoholic beverages can raise substantial issues of public importance," and concluded that the issue of whether or not to drink "may assume the proportions of a controverted issue of public importance." 11 F.C.C. at 199. It did not,

however, deny renewal of the respondent station's license for failure to provide time to the temperance advocates.

36. Radio Television News Directors Ass'n v. United States (FCC), *supra* note 32.

37. The Commission has, upon rare occasion, identified specific issues it regards as controversial. *E.g.*, Petition of Sam Morris, *supra* note 34; Robert Harold Scott, 3 P & F Radio Reg. 259 (1946). But it has not previously gone so far as to prescribe the frequency with which opposing views must be broadcast.

38. The Commission has refused to require reply time for atheists who wish to respond to the implicit theism of broadcast church services. Mrs. Madalyn Murray, 5 P & F Radio Reg.2d 263 (1965). *But see*, Robert Harold Scott, *supra* note 37.

39. Cigarette Advertising, *supra* note 8, 9 F.C.C.2d at 949.

serious potential hazard to public health. Ordinarily the question presented would be how the carriage of such commercials is consistent with the obligation to operate in the public interest. In view of the Legislative history of the Cigarette Labeling Act, that question is one reserved for judgment of the Congress upon the basis of the studies and reports submitted to it. * * * But there is, we think, no question of the continuing obligation of a licensee who presents such commercials to devote a significant amount of time to informing his listeners of the other side of the matter—that however enjoyable smoking may be, it represents a habit which may cause or contribute to the earlier death of the user. This obligation stems not from any esoteric requirements of a particular doctrine but from the simple fact that the public interest means nothing if it does not include such a responsibility.[40]

The fairness doctrine, we think, serves chiefly to put flesh on these policy bones by providing a familiar mold to define the general contours of the obligation imposed.

The attack on the alleged statutory authority for this "public interest" ruling takes two forms: (1) a general denial that the Commission has any authority to supervise the content of broadcasting under the public interest standard; and (2) an argument that any delegation of the power to make ad hoc public interest determinations of this kind is invalid for want of adequate limiting standards.

A. *The Commission's authority over broadcast content in general*

Nothing in the Communications Act of 1934 [41] expressly grants the Commission any general authority over programming. The most relevant provisions go no further than to authorize it to grant and renew broadcast licenses according to the dictates of the "public interest, convenience, and necessity." [42] A case could be made, as an abstract proposition, that this licensing power is limited to policing the traffic over the airwaves to prevent interference between stations and perhaps to assure a minimum level of technical competence. If the question were *res nova*, that case would receive substantial support from the Supreme Court decisions requiring a clear mandate for regulatory activity which brushes closely against sensitive constitutional areas.[43]

■ But the argument was in fact made and rejected long ago in National Broadcasting Company v. United States.[44] Justice Frankfurter, speaking for the Court, said in part:

"An important element of public interest and convenience affecting the issue of a license is the ability of the licensee to render the best practicable service to the community reached by his broadcasts." Federal Communications Comm. v. Sanders Bros. Radio Station, 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 869, 1037. The Commission's licensing function cannot be discharged, therefore, merely by finding that there are no technological objections to the granting of a license. If the criterion of "public interest" were limited to such matters, how could the Commission choose between two applicants for the same facilities, each of whom is financially and technically qualified to operate a station? Since the very inception of federal regulation by radio [*sic*], comparative considerations as to the services to be rendered have governed the application of the standard of "public interest, convenience, or necessity." * * *

40. *Id.*

41. 47 U.S.C. § 301 *et seq.* (1964).

42. 47 U.S.C. § 307(a), (d) (1964).

43. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958); Hannegan v. Esquire, Inc., 327 U.S. 146, 66 S.Ct. 456, 90 L.Ed. 586 (1946).

44. 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

The avowed aim of the Communications Act of 1934 was to secure the maximum benefits of radio to all the people of the United States. To that end Congress endowed the Communications Commission with comprehensive powers to promote and realize the vast potentialities of radio. * * *

These provisions, individually and in the aggregate, preclude the notion that the Commission is empowered to deal only with technical and engineering impediments to the "larger and more effective use of radio in the public interest." [45]

In fact, neither courts nor Commission have thought it had to make its decisions among competing applicants blindfolded to the content of their programs.[46] Both the old Radio Commission and the FCC have likewise refused to renew licenses on the basis of past programming not in the public interest,[47] and this Court affirmed such a refusal as long ago as 1931.[48] If agency power to designate programming "not in the public interest" is a slippery slope, the Commission and the courts started down it too long ago to go back to the top now unless Congress or the Constitution sends them. But Congress has apparently specifically endorsed this understanding of the public interest.[49] And whatever the limits im-

45. *Id.* at 217, 63 S.Ct. at 1010.

46. In Simmons v. FCC, 83 U.S.App.D.C. 262, 264, 169 F.2d 670, 672, *cert. denied*, 335 U.S. 846, 69 S.Ct. 67, 93 L.Ed. 396 (1948), this court said:
 [W]e are asked to regard the Commission as a kind of traffic officer, policing the wave lengths to prevent stations from interfering with each other. But the Act does not restrict the Commission merely to supervision of the traffic. It puts ·upon the Commission the burden of determining the composition of that traffic.
 *See also, e.g.,* Henry v. FCC, 112 U.S. App.D.C. 247, 302 F.2d 191, cert. denied, 371 U.S. 821, 83 S.Ct. 37, 9 L.Ed.2d 60 (1962); Allen B. Dumont Laboratories v. Carroll, 184 F.2d 153, 156 (3 Cir. 1950); Bay State Beacon v. FCC, 84 U.S.App. D.C. 216, 171 F.2d 826 (1948). *See generally* Note, "Regulation of Program Content by the FCC," 77 HARV.L.REV. 701 (1964) and numerous cases cited therein. Also noteworthy in this regard is the concurring opinion of Justice Brennan in Head v. New Mexico Board of Examiners, 374 U.S. 424, 433, 83 S.Ct. 1759, 10 L. Ed.2d 983 (1963), which grapples at length with the possibility that the FCC's authority to regulate advertising content is so complete as to exclude any state regulation in that area. Justice Brennan concludes that not all state regulation is excluded, but observes that Congress's "failure expressly to regulate *nondeceptive* advertising surely does not deprive the FCC of all such jurisdiction * * *" *Id.* at 444, 83 S.Ct. at 1771.

47. Community Broadcasting Service, 13 P & F Radio Reg. 179 (1955); Port Frere Broadcasting Co., 5 P & F Radio Reg. 1137 (1950); Trinity Methodist Church, South v. Federal Radio Commission, 61 U.S.App.D.C. 311, 62 F.2d 850 (1932); cert. denied, 288 U.S. 599, 53 S.Ct. 317, 77 L.Ed. 975 (1933); KFKB Broadcasting Ass'n v. Federal Radio Commission, 60 App.D.C. 79, 47 F.2d 670 (1931).

48. In *KFKB Broadcasting Ass'n, supra* note 47, this court upheld the denial of a license to a station which regularly broadcast a program in which a doctor diagnosed illnesses and prescribed medicines on the basis of symptoms described in listeners' letters. The grounds for denial were both that the doctor, who controlled the station, was using it for his own private interests and also that the "medical question box" program was "inimical to the public health and safety, and for that reason [was] not in the public interest." 60 App.D.C. at 80, 47 F.2d at 672. The court said:
 It is apparent, we think, that the [broadcasting] business is impressed with a public interest and that, because the number of available broadcasting frequencies is limited, the Commission is necessarily called upon to consider the character and quality of the service to be rendered. In considering an application for a renewal of the license, an important consideration is the past conduct of the applicant, for "by their fruits shall ye know them." Matt. VII:20.
 *Id.* at 81, 47 F.2d at 672. *Accord*, Trinity Methodist Church, South, *supra* note 47.

49. In 1959, Congress amended the provision requiring broadcasters to provide equal

posed by the First Amendment, we do not think it requires eradicating every trace of a programming component from the public interest standard.[50]

The power to refuse a license on grounds of past or proposed programming necessarily entails some power to define the stations' public interest obligations with respect to programming. It is this power to specify material which the public interest requires or forbids to be broadcast that carries the seeds of the general authority to censor denied by the Communications Act[51] and the First Amendment alike. But elementary canons of administrative and constitutional law prevent the Commission from terminating a license without giving reasons or from condemning a station's overall programming as inimical to the public interest without identifying the offending material and particularizing the public interest. And if the Commission must explain its view of the public interest when it denies or revokes a license, it may surely give advance notice of its views by way of an official ruling which is subject to judicial review. Indeed, in some cases fairness to the stations may require some advance warning of their responsibilities.

Thus, in applying the public interest standard to programming, the Commission walks a tightrope between saying too much and saying too little. In most areas it has resolved this dilemma by imposing only general affirmative duties—e. g., to strike a balance between the various interests of the community,[52] or to provide a reasonable amount of time for the presentation of programs devoted to the discussion of public issues.[53] The licensee has broad discretion in giving specific content to these duties, and on application for renewal of a license it is understood the Commission will focus on his overall performance and good faith rather than on specific errors it may find him to have made.[54] In practice, the Commission rarely denies licenses for breaches of these duties.[55] Given its long-established authority to consider program content, this general approach probably minimizes the dangers of censorship or pervasive supervision.

In other areas, however, the Commission has on occasion imposed more specific duties or found specific programs or

time to opponents of candidates for public office who use their stations, 47 U.S.C. § 315 (1964), in order to exempt bona fide newscasts, news interviews, news documentaries, etc., from that requirement. In so doing it included the proviso that nothing in the exemption

> shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from *the obligation imposed upon them under this chapter to operate in the public interest* and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.

73 Stat. 557 (1959), 47 U.S.C. § 315(a) (1964) (emphasis added). At the very least, this language appears to be an acknowledgment of and acquiescence in the settled Commission and judicial construction that the public interest standard applies to program content.

50. *Infra*, Part III.

51. Section 326 of the Communications Act of 1934 provides:

> Nothing in this chapter shall be understood or construed to give the Commission the power of censorship * * *, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication.

47 U.S.C. § 326 (1964).

52. Editorializing by Broadcast Licensees, *supra* note 33, 13 FCC at 1247–48.

53. *Id.* at 1249.

54. *Id.* at 1251–1252.

55. "Generally, where objectionable matter has been broadcast in particular instances, renewal of licenses has been granted, usually upon a showing that program services were otherwise meritorious and in the public interest and the objectionable matter discontinued. * * *" Note, "Governmental Regulation of the Program Content of Television Broadcasting," 19 G.W.L.Rev. 312, 317 (1950). *See also* Note, "Regulation of Program Content by the FCC," *supra* note 46, at 703–704.

advertisements to be contrary to the public interest.[56] Such rulings must be closely scrutinized lest they carry the Commission too far in the direction of the forbidden censorship. But particularity is not in itself a vice; indeed, in some circumstances it may serve to limit an otherwise impermissibly broad intrusion upon a licensee's individual responsibility for programming.

### B. *The authority for the cigarette ruling in particular*

Thus, in the context of the Communications Act as it has long been understood, we do not think that public interest rulings relating to specific program content invariably amount to "censorship" within the meaning of the Act.[57] However, there is high risk that such rulings will reflect the Commission's selection among tastes, opinions, and value judgments, rather than a recognizable public interest. Especially with First Amendment issues lurking in the near background, the "public interest" is too vague a criterion for administrative action unless it is narrowed by definable standards.[58]

The ruling before us neither forbids nor requires the publication of any specific material. But as an extension of the fairness doctrine it is an unusual limitation of the licensee's discretion. And as an independent public interest ruling it requires independent support. We cannot uphold it merely on the ground that it may reasonably be thought to serve the public interest.

Whatever else it may mean, however, we think the public interest indisputably includes the public health.[59] There is

---

56. *E. g.*, Petition of Sam Morris, *supra* note 34; Robert Harold Scott, *supra* note 37; KFKB Broadcasting Ass'n v. Federal Radio Commission, Trinity Methodist Church, South v. FCC, and Port Frere Broadcasting Co., all *supra* note 47; Mile High Station, Inc., 20 P & F Radio Reg. 345 (1960); WSBC, Inc., 2 F.C.C. 293 (1936); Oak Leaves Broadcasting, 2 F. C.C. 298 (1936); Farmers & Bankers Life Insurance Co., 2 F.C.C. 455 (1936); and cases cited in Note, "Governmental Regulation of the Program Content of Television Broadcasting," *supra* note 55, at 317 n. 27, 317–318 n. 28.

57. See note 51, *supra*. It is not clear whether Congress originally thought that such rulings as to program content would constitute "censorship." See Note, 46 HARV.L.REV. 987, 990 (1933). But in view of the settled administrative practice of issuing such rulings and opinions, the doubtful issue of construction must be resolved in the negative. See Note, "Regulation of Program Content by the FCC," *supra* note 46, at 715.

58. The Supreme Court has suggested that the "public interest" standard may be narrowed by interpreting it in the light of "its context, * * * the nature of radio transmission and reception, [and] * * * the scope, character, and quality of services * * *." Federal Radio Commission v. Nelson Brothers Bond & Mortgage Co., 289 U.S. 266, 285, 53 S. Ct. 627, 636, 77 L.Ed. 1166, 89 A.L.R. 406 (1933). While these criteria may be sufficiently precise administrative standards to govern regulation of technical performance and selection among competing applicants, however, we think they are too amorphous, without more, to support supervision over programming.

59. Petitioners WTRF-TV and the National Association of Broadcasters argue that, if the FCC has any authority with respect to advertising, it can apply only the more specific standard Congress has established to guide the Federal Trade Commission, which they say is vested with "primary" authority to regulate advertising. Thus, they would limit the FCC's role to policing "unfair methods of competition * * * and unfair or deceptive acts or practices," Federal Trade Commission Act § 5 (1914), 15 U.S.C. § 45(a) (1964), at least absent any considerations peculiar to broadcasting. Their sole authority for that proposition is FCC v. American Broadcasting Co., 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954). That case, however, is not in point. There, the FCC had adopted regulations disapproving of give-away programs on the ground that they were "lotteries" within the meaning of federal prohibitory statutes. The Supreme Court reversed on the ground that the FCC had misread the criminal statutes, but that reversal did not in itself preclude FCC authority to prohibit such programs as inconsistent with the public interest. SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). In any case, the standard of the Federal

perhaps a broader public consensus on that value, and also on its core meaning, than on any other likely component of the public interest. The power to protect the public health lies at the heart of the states' police power. It has sustained many of the most drastic exercises of that power, including quarantines, condemnations, civil commitments, and compulsory vaccinations. Likewise, public health concerns now support a sizable portion of the civilian federal bureaucracy. The public health has in effect become a kind of basic law, both justifying new extensions of old powers and evoking the legitimate concern of government wherever its regulatory power otherwise extends.

 The Radio Commission, predecessor to the FCC, assumed with judicial approval and without question that broadcasting of specious medical information was not in the public interest.[60] In the Communications Act of 1934, Congress transferred the Radio Commission's authority to license in the "public interest, convenience and necessity" to the FCC,[61] which has also ruled specific controversial health claims to be not in the public interest.[62] Given the premise that the "public interest" may include some of the content as well as the technical quality of broadcasting, we are satisfied that it includes the public health. But were there any initial doubt, in the absence of evidence to the contrary we think Congress must be deemed to have acquiesced in the determinations to that effect of both Commissions on a matter of such basic and universally recognized importance.

The public health standard removes much of the vagueness and over-breadth attending the standard of the public interest. But we are not prepared to say that the Commission is authorized to condemn every broadcast which might, without arbitrariness or caprice, be thought to pose some danger to the public health. Even the relatively precise concept of the public health is murky at the fringes, and in some cases what is concededly optimal health may be a less important public value than other conflicting interests. Finally, the Commission itself has no special expertise to make it the appropriate arbiter of controversies over whether particular broadcasting is dangerous to health.

But the ruling on cigarette advertising is vulnerable to none of these objections against a broad mandate to the Commission to consider the public health.[63] The danger cigarettes may pose to health is, among others, a danger to life itself. As the Commission emphasized, it is a danger inherent in the normal use of the product, not one merely associated with its abuse or dependent on intervening fortuitous events. It threatens a substantial body of the population, not merely a peculiarly susceptible fringe group. Moreover, the danger, though not established beyond all doubt, is documented by a compelling cumulation of statistical evidence. The only member of the Commission to express doubts about the validity of its ruling had no doubts about the validity of its premise that, in all probability, cigarettes are dangerous to health:[64]

Trade Act is applicable only to regulation of advertising. While the obligations imposed under the cigarette ruling arise from and are conditioned upon the broadcasting of cigarette advertising, the ruling does not regulate advertising. Rather, it has the effect of regulating stations which carry advertising by requiring them to inform the public.

60. KFKB Broadcasting Ass'n v. Federal Radio Commission, *supra* note 47.

61. 47 U.S.C. § 307 (1964).

62. WSBC, Inc., Oak Leaves Broadcasting, Inc., Farmers & Bankers Life Insurance Co., all *supra* note 56.

63. We agree with the Commission that "cigarette advertising presents a unique situation," and we note that the Commission "do[es] not now know" of any other advertised product which would warrant a comparable ruling. Cigarette Advertising, *supra* note 8, 9 F.C.C.2d at 943.

64. The Commission correctly noted that it "is not the proper arbiter of the scientific

Cigarette smoking is a substantial hazard to the health of those who smoke which increases both with the number of cigarettes smoked and with the youthfulness when smoking is started. Cigarette smoking increases both the likelihood of the occurrence and the seriousness of the consequences of various types of cancer, of cardiovascular failures and of numerous other pathologies of smokers. These conclusions are established by overwhelming scientific evidence, by the findings of Government agencies, and by Congressional reports and statute. * * * The evidence on this subject is not conclusive, but scientific evidence is never conclusive. All scientific conclusions are probablistic (sic) * * * Furthermore, law does not and cannot demand conclusive proof. Even in a capital case, the law requires only proof beyond a reasonable doubt. * * * The evidence as to the dangers of cigarette smoking to the smoker is clearly beyond a mere preponderance and approaches proof beyond a reasonable doubt.[65]

Finally, the Commission expressly refused to rely on any scientific expertise of its own.[66] Instead, it took the word of the Surgeon General's Advisory Committee,[67] whose findings had already been adopted in substance by the Department of Health, Education and Welfare,[68] the Federal Trade Commission,[69] and the Senate Commerce Committee,[70] and had in addition been recognized and acted upon by Congress itself in the Cigarette Labeling Act.

In these circumstances, the Commission could reasonably determine that

and medical issue * * * and of course has not sought to resolve it." *Id.* at 949. But the "controversial issue" to which its ruling is addressed is not whether cigarette smoking is dangerous, but whether, in view of its authoritatively documented dangers, it is desirable:

It comes down, we think, to a simple controversial issue: the cigarette commercials are conveying any number of reasons why it appears desirable to smoke, but understandably do not set forth the reasons why it is not desirable to commence or continue smoking. It is the affirmative presentation of smoking as a desirable habit which constitutes the viewpoint others desire to oppose.

*Id.* at 939.

65. *Id.*, concurring opinion of Commissioner Loevinger at 952–953.

66. See note 64, *supra.*

67. On January 11, 1964, the report of the Surgeon General's Advisory Committee concluded that cigarette smoking contributes substantially to mortality from certain specific diseases and to the overall death rate. The Committee recommended that "cigarette smoking is a health hazard of sufficient importance in the United States to warrant appropriate remedial action."
Cigarette Advertising, *supra* note 8, Appendix A at 950.

68. The Department promptly established the National Interagency Council on Smoking and Health in order, *inter alia,* to

use its professional talents to bring to the Nation—particularly the young—an increasing awareness of the health hazards of cigarette smoking. * * *

*Id.*, Appendix A at 951. In 1967, HEW also released the Surgeon General's "Report on Current Information on the Health Consequences of Smoking," which reaffirmed the conclusions of the 1964 Report, *supra* note 67, on the basis of more than 2,000 subsequent research studies. This report asserted that cigarette smokers have substantially higher death and disability rates than comparable non-smokers and that a substantial number of earlier deaths and disabilities would not have occurred if the victims had never smoked. *Id.* at 936–937.

69. Note 20, *supra.*

70. While there remain [sic] a substantial number of individual physicians and scientists—the Commerce Committee received testimony from 39 of them—who do not believe that it has been demonstrated scientifically that smoking causes lung cancer or other diseases, no prominent medical or scientific body undertaking a systematic review of the evidence has reached conclusions opposed to those of the Surgeon General's Advisory Committee.
S.Rep.No. 195, 89th Cong., 1st Sess., p. 3 (1965).

news broadcasts, private and governmental educational programs, the information provided by other media, and the prescribed warnings on each cigarette pack, inadequately inform the public of the extent to which its life and health are most probably in jeopardy. The mere fact that information is available, or even that it is actually heard or read, does not mean that it is effectively understood. A man who hears a hundred "yeses" for each "no," when the actual odds lie heavily the other way, cannot be realistically deemed adequately informed. Moreover, since cigarette smoking is psychologically addicting, the confirmed smoker is likely to be relatively unreceptive to information about its dangers; his hearing is dulled by his appetite. And since it is so much harder to stop than not to start, it is crucial that an accurate picture be communicated to those who have not yet begun.

Thus, as a public health measure addressed to a unique danger authenticated by official and congressional action, the cigarette ruling is not invalid on account of its unusual particularity. It is in fact the product singled out for special treatment which justifies the action taken. In view of the potentially grave consequences of a decision to continue—or above all to start—smoking, we think it was not an abuse of discretion for the Commission to attempt to insure not only that the negative view be heard, but that it be heard repeatedly. The Commission has made no effort to dictate the content of the required anti-cigarette broadcasts. It has emphasized that the responsibility for content, source, specific volume, and precise timing rests with the good faith discretion of the licensee.[71]

▮▮▮ The cigarette ruling does not convert the Commission into either a censor or a big brother. But we emphasize that our cautious approval of this particular decision does not license the Commission to scan the airwaves for offensive material with no more discriminating a lens than the "public interest" or even the "public health."

### III. THE FIRST AMENDMENT

It is difficult to separate the First Amendment question from the question of the Commission's authority. Section 326 of the Communications Act expressly provides that "no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication."[72] It might reasonably be thought that "the right of free speech," is shorthand for the First Amendment. But since constructions of the First Amendment have broadened since 1934, and inasmuch as the First Amendment argument advanced in this case challenges a long-settled construction of the Act, we treat the constitutional question separately for purposes of analysis.

### A. Regulation of broadcast content under the First Amendment in general

▮▮▮ Intervenors NBC, et al. argue cogently that the public interest standard cannot constitutionally now include any component of program content. They say the First Amendment obviously would not tolerate administrative supervision of the material published by the newspaper press. The radio press was initially treated differently only because (1) peculiar technical factors require a policeman to prevent interference between different stations, and (2) the then available broadcasting channels were so limited in number that the Commission could hardly ignore all considerations of the nature and quality of programming in choosing among applicants. The first reason does not justify supervision of content, they say, and the second, if ever sufficient, is an anachronism now that the available channels often outnumber the applicants and the broadcasting stations serving most areas far outnumber

---

71. Cigarette Advertising, *supra* note 8, at 941–942.

72. *Supra* note 51.

the newspapers.[73] Accordingly, in their view the First Amendment now limits the Commission's licensing discretion to technological considerations; the content of broadcasting, like that of the publishing press, must be left entirely to the licensees and ultimately to the market.

This argument has considerable force. First Amendment complaints against FCC regulation of content are not adequately answered by mere recitation of the technically imposed necessity for *some* regulation of broadcasting and the conclusory propositions that "the public owns the airwaves" and that a broadcast license is a "revocable privilege." [74] It may well be that some venerable FCC policies cannot withstand constitutional scrutiny in the light of contemporary understanding of the First Amendment and the modern proliferation of broadcasting outlets.

On the other hand, we cannot solve such complex questions by replacing one set of shibboleths with another. The First Amendment is unmistakably hostile to governmental controls over the content of the press,[75] but that is not to say that it necessarily bars every regulation which in any way affects what the newspapers publish. Even if it does, there may still be a meaningful distinction between the two media justifying different treatment under the First Amendment. Unlike broadcasting, the written press includes a rich variety of outlets for expression and persuasion, including journals, pamphlets, leaflets, and circular letters, which are available to those without technical skills or deep pockets.[76] Moreover, the broadcasting medium may be different in kind from publishing in a way which has particular relevance to the case at hand. Written messages are not communicated unless they are read, and reading requires an affirmative act. Broadcast messages, in contrast, are "in the air." In an age of omnipresent radio, there scarcely breathes a /citizen who does not know some part of a leading cigarette jingle by heart. Similarly, an ordinary habitual television watcher can *avoid* these commercials only by frequently leaving the room, changing the channel, or doing some other such affirmative act. It is difficult to calculate the subliminal impact of this pervasive propaganda, which may be heard even if not listened to, but it may reasonably be

73. See Radio Television News Directors Ass'n v. United States (FCC) *supra*, note 32, 400 F.2d pp. 1018–1020, where the Seventh Circuit declared that the historical distinction between press and broadcasting is untenable for First Amendment purposes.

74. See G. Robinson, The FCC and the First Amendment: Observations on 40 Years of Radio and Television Regulations, 52 Minn.L.Rev. 67, 152 (1967):

75. *E.g.*, Near v. State of Minnesota, ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L. Ed. 1357 (1931).

76. It has also been suggested that a difference in the working of the market mechanism in the two media may justify a difference in the scope of permissible regulation under the First Amendment. It is in a newspaper's economic interest, it is said, to include features which may appeal only to a limited or specialized audience. The cost of adding a page to include special features is relatively small compared to the advertising and subscription revenue which may be expected from the resulting increase in circulation. But a broadcaster can appeal to only one audience at a time. If he devotes an hour to programs appealing to a minority taste, he foregoes the chance to compete for the greater advertising revenues consequent upon reaching a larger audience. Accordingly, it may be that even newspaper monopolies are more likely than broadcasters to serve the entire public without regulatory prodding. See Note, "Regulation of Program Content by the FCC," *supra* note 46, at 714. For support from economists for the proposition that broadcasters will compete for the majority audience at the expense even of a sizable minority taste, see J. Dirlam and A. Kahn, The Merits of Reserving the Cost-Savings from Domestic Communications Satellites for Support of Educational Television, 77 Yale L.J. 494, 515–517 (1968).

thought greater than the impact of the written word.[77]

## B. *Constitutionality of the cigarette ruling in particular*

■ These considerations are at least sufficient to convince us that we are not obliged simply to "invalidate the entire course of broadcasting development"[78] with no inquiry into the particulars of the ruling before us. Rather, we think the proper approach to the difficult First Amendment issues petitioners raise is to consider them in the context of individual regulatory policies and practices on a case-by-case basis. On this approach, since the narrow public health power which supports the cigarette ruling does not "sweep * * * widely and * * * indiscriminately" across protected freedoms,[79] the constitutional question before us is only whether the Communications Act, construed to authorize a public health ruling in the circumstances of this case, offends the First Amendment. And whatever the constitutional infirmities of other regulations of programming, we

are satisfied that the cigarette ruling does not abridge the First Amendment freedoms of speech or press. We reach this conclusion in the light of the following considerations:

(1) The cigarette ruling does not ban any speech. In traditional doctrinal terms, the constitutional argument against it is only that it may have a "chilling effect" on the exercise of First Amendment freedoms by making broadcasters more reluctant to carry cigarette advertising.

(2) The speech which might conceivably be "chilled" by this ruling barely qualifies as constitutionally protected "speech." It is established that some utterances fall outside the pale of First Amendment concern.[80] Many cases indicate that product advertising is at least less rigorously protected than other forms of speech.[81] Promoting the sale of a product is not ordinarily associated with any of the interests the First Amendment seeks to protect. As a rule, it does not affect the political process,

**77.** The effectiveness of the television commercial is hardly disputed, for it alone appeals to both of man's most receptive senses—hearing and seeing. * * * Psychological memory experiments indicate strongly that people tend to remember advertising messages presented by a combination of visual and auditory methods significantly more than those presented by either method alone. See *e.g.*, Elliott, Memory for Visual Auditory, and Visual-Auditory Material, 29 ARCHIVES OF PYSCHOLOGY No. 199, at 52–54 (1936).
Note, "Illusion or Deception: The Use of 'Props' and 'Mock-ups' in Television Advertising," 72 YALE L.J. 145, 156 n. 46 (1962). See generally, V. Packard, THE HIDDEN PERSUADERS (1957).

**78.** Note, "Regulation of Program Content by the FCC," *supra* note 46, at 715.

**79.** Aptheker v. Secretary of State, 378 U.S. 500, 514, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964).

**80.** Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

**81.** Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942);

Breard v. City of Alexandria, 341 U.S. 622, 642, 71 S.Ct. 920, 95 L.Ed. 1233, 35 A.L.R.2d 335 (1951); Murdock v. Pennsylvania, 319 U.S. 105, 110–111, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); Martin v. City of Struthers, 319 U.S. 141, 142 n. 1, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); Jamison v. Texas, 318 U.S. 413, 417, 63 S.Ct. 669, 87 L.Ed. 869 (1943). In Head v. New Mexico Board of Examiners, the Supreme Court upheld as a health measure a state law prohibiting price-advertising by optometrists. 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963). It did not reach the First Amendment question because that question had not been properly raised in the state court. *Id.* at 433 n. 12, 183 S.Ct. 1759. However, in a lengthy concurring opinion, supra note 46, Justice Brennan considered the principal issue to be whether in the Communications Act Congress had occupied the field of regulation of broadcast advertising. *Id.* at 433 *et seq.*, 83 S.Ct. 1759. There was no dissent. The Court's collective treatment of this case strongly discounts the possibility that it thought such regulation poses serious constitutional problems.

does not contribute to the exchange of ideas, does not provide information on matters of public importance, and is not, except perhaps for the ad-men, a form of individual self-expression. It is rather a form of merchandising subject to limitation for public purposes like other business practices. In the instant case, this argument is not dispositive because the cigarette ruling was premised on the fact that cigarette advertising implicitly states a position on a matter of public controversy. But though this advertising strongly implies that cigarette smoking is a desirable habit, petitioners have correctly insisted that the advertisements in question present no information or arguments in favor of smoking which might contribute to the public debate. Accordingly, even if cigarette commercials are protected speech, we think they are at best a negligible "part of any exposition of ideas, and are of * * * slight social value as a step to truth * * *." [82]

(3) In any event, the danger that even this marginal "speech" will be significantly chilled as a result of the ruling is probably itself marginal. We cannot, of course, undertake an economic analysis to determine the probability that the volume of cigarette advertising over radio and television will decline. We can say with fair certainty, however, that the cigarette manufacturers' interest in selling their product guarantees a continued resourceful effort to reach the public. We note also that cigarette advertising accounts for a sizable portion of broadcasting revenues,[83] and we think it at best doubtful that many stations will refuse to carry cigarette commercials in order to avoid the obligations imposed by the ruling.[84]

(4) Even if some valued speech is inhibited by the ruling, the First Amendment gain is greater than the loss. A primary First Amendment policy has been to foster the widest possible debate and dissemination of information on matters of public importance.[85] That policy has been pursued by a general hostility toward any deterrents to free expression. The difficulty with this negative approach is that not all free speakers have equally loud voices, and success in the marketplace of ideas may go to the advocate who can shout loudest or most often. Debate is not primarily an end in itself, and a debate in which only one party has the financial resources and interest to purchase sustained access to the mass communications media is not a fair test of either an argument's truth or its innate popular appeal.

Countervailing power on the opposite sides of many issues of public concern often neutralizes this defect. In many other cases, the courts must act as if such an inherent balancing mechanism were at work in order to avoid either weighing the worth of conflicting views or emasculating the robust debate they seek to promote. If the fairness doctrine cannot withstand First Amendment scrutiny, the reason is that to insure a balanced presentation of controversial issues may

---

82. Chaplinsky v. New Hampshire, *supra* note 80, 315 U.S. at 572, 62 S.Ct. at 769.

83. The briefs indicate that radio and television revenues from cigarette advertising total nearly $300,000,000 annually and account for more than 7% of all television advertising revenue.

84. The Commission has in fact promised to "tailor the requirement that a station which carries cigarette commercials provide a significant amount of time for the other viewpoint, so as not to preclude or curtail presentation by stations of cigarette advertising that they choose to carry." Cigarette Advertising, *supra* note 8, at 944.

85. *See, e.g.,* Curtis Publishing Co. v. Butts, 388 U.S. 130, 148–150, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (opinion of Justice Harlan); New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964); NAACP v. Button, 371 U.S. 415, 429, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

be to insure no presentation, or no vigorous presentation, at all.[86] But where, as here, one party to a debate has a financial clout and a compelling economic interest in the presentation of one side unmatched by its opponent, and where the public stake in the argument is no less than life itself—we think the purpose of rugged debate is served, not hindered, by an attempt to redress the balance.[87]

(5) Finally, not only does the cigarette ruling not repress any information, it serves affirmatively to provide information. We do not doubt that official prescription in detail or in quantity of what the press must say can be as offensive to the principle of a free press as official prohibition. But the cigarette ruling does not dictate specific content and, in view of its special context, it is not a precedent for converting broadcasting into a mouthpiece for government propaganda. And the provision of information is no small part of what the First Amendment is about. A political system which assigns vital decisions to individual free choice assumes a well-informed citizenry. We do not think the principle of free speech stands as a barrier to required broadcasting of facts and information vital to an informed decision to smoke or not to smoke.

## IV. OTHER CONTENTIONS

The resolution of these basic questions leaves a residue of unanswered contentions. Mr. Banzhaf's complaint that the anti-smokers should have been granted equal time need not detain us. Even if it had authority to specify equal time, the Commission could reasonably find such a specific requirement an unnecessary intrusion upon the licensees' discretion. Likewise, the Commission did not abuse its discretion in refusing to require rebuttal time for the cigarette manufacturers. The public health rationale which supports the principal ruling would hardly justify compelling broadcasters to inform the public that smoking might *not* be dangerous. And an issue of "fairness" arises principally because the cigarette manufacturers are deterred from making health claims in their advertisements by the FTC's warning that such claims would be "unfair and deceptive."[88] If the FTC's determination is in error, the remedy does not lie in a further particularization of the FCC's fairness doctrine.

86. The main thrust of the Seventh Circuit opinion invalidating the FCC's personal attack rules under the First Amendment is that "strict compliance with the rules might result in a blandness and neutrality pervading all broadcasts arguably within the scope of the rules." Radio Television News Directors Ass'n v. United States (FCC), *supra* note 32, 400 F.2d p. 1014. The rules themselves, the Court said, "reflect an apparent desire on the Commission's part to neutralize (or perhaps to eliminate altogether) the expression of points of view on controversial issues and political candidates. Such a result would be patently inconsistent with protecting the invaluable function served by the broadcast press in influencing public opinion and exposing public ills." *Id.*, p. 1014. Thus, the Court was concerned that both the amount and the vigor of debate might be reduced.

87. *Cf.* Radio Television News Directors Ass'n v. United States (FCC), *supra* notes 32 and 86: "[T]he rules could be sustained only if the Commission demonstrated a significant public interest in the attainment of fairness in broadcasting * * * and that it is unable to attain such fairness by less restrictive and oppressive means." (p. 1020). In the instant case, we think that on balance First Amendment interests are advanced by the Commission's ruling. Moreover, the additional public interest at stake is compelling. And the technique of requiring the presentation of opposing views is markedly less "restrictive and oppressive" than many attacks on the cigarette-health problem which might well be within the power of federal agencies, but for the Cigarette Labeling Act.

88. *E.g.*, FTC, Order Vacating Trade Regulation Rule, 30 Fed.Reg. 9484, 9485 (1965). Industry codes also disapprove of affirmative health claims in cigarette advertising, but in the circumstances we hardly think this self-regulation makes out a sufficient case to require compensatory relief from the FCC.

Finally, The Tobacco Institute contends that the Commission's ruling is void on account of procedural irregularities. The initial ruling was made without providing interested parties either notice or an opportunity to be heard. But since the Commission subsequently entertained numerous petitions for review, wrote a thorough opinion affirming its ruling, and made the ruling prospective from the date of the affirming order, we find no prejudice to substantial rights. The Tobacco Institute also intimates that the Commission should have held an oral hearing, should have made factual investigations of its own, or should have instituted a full-fledged rulemaking proceeding, before issuing its ruling. As a general rule, we agree that more careful procedures are required to support innovation by an administrative agency. But the essential premises of the instant ruling are only (1) that cigarette advertising inherently promotes cigarette smoking as a desirable habit, (2) that very substantial medical and scientific authority regards this habit as highly dangerous to health and therefore undesirable, and (3) that in view of the volume of cigarette advertising, existing sources were inadequate to inform the public of the nature and extent of the danger. These premises are supported by the record. We do not see, and The Tobacco Institute has never suggested, what evidence a more extensive proceeding might have produced to refute them.

Affirmed.

WILBUR K. MILLER, Senior Circuit Judge:

I concur in the affirmance of No. 21,-285, Banzhaf v. Federal Communications Commission and United States, but I dissent from the affirmance of Nos. 21,525–6, WTRF-TV v. Federal Communications Commission and United States, and from the affirmance of No. 21,577, Tobacco Institute, Inc. v. Federal Communications Commission and United States.