**CAPITAL BROADCASTING COMPANY et al., Plaintiffs,**

v.

**John MITCHELL, Attorney General of the United States, and Thomas Flannery, United States Attorney for the District of Columbia, Defendants.**

**Civ. A. No. 3495–70.**

United States District Court,
District of Columbia.

Oct. 14, 1971.

Paul Dobin and Ian D. Volner, Washington, D. C., for plaintiffs.

Patrick Gray, III, Asst. Atty. Gen., Thoma Flannery, U. S. Atty., Gil Zimmerman, Joseph Hannon, Asst. U. S. Attys., and William S. Mount, Department of Justice, Washington, D. C., for defendants.

Before WRIGHT, Circuit Judge, and GASCH and GREEN, District Judges.

## MEMORANDUM OPINION

GASCH, District Judge.

Petitioners, six corporations which operate radio stations under licenses granted by the Federal Communications Commission, seek to enjoin enforcement of Section 6 of the Public Health Cigarette Smoking Act of 1969 and to have Section 6 declared violative of the First and Fifth Amendments to the Constitution. The National Association of Broadcasters has been permitted to intervene.

The Court requested Professor John F. Banzhaf, III to file a brief amicus curiae. Plaintiff and intervenor have filed replies to the amicus brief. The Court wishes to take this opportunity of expressing its appreciation of Professor Banzhaf's analysis of the issues and his contribution to their resolution.

This three-judge court was convened pursuant to petitioners' application under 28 U.S.C. §§ 2282 and 2284. We conclude that the Act in question does not conflict with the First or Fifth Amendment.

In 1965, in an attempt to alert the general public to the documented dangers of cigarette smoking, Congress enacted legislation requiring a health warning to be placed on all cigarette packages.[1] By 1969 it was evident that more stringent controls would be required[2] and that both the FCC[3] and the

---

1. The Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1331 et seq. (1965). The required warning states: "Caution: Cigarette Smoking May be Hazardous to Your Health."

2. HEW, Report to Congress, 1968, FTC, Report to Congress, 1967, as reported in H.R.Rep.No.91–566, 91st Cong., 1st Sess. 3–6 (1969).

3. Id., at 6.

FTC[4] were considering independent action. Under such circumstances Congress enacted the Public Health Cigarette Smoking Act of 1969,[5] (hereafter referred to as the Act) which, as pertinent hereto, provides:

"Sec. 6. After January 1, 1971, it shall be unlawful to advertise cigarettes on any medium of electronic communication subject to the jurisdiction of the Federal Communications Commission."

 Petitioners allege that the ban on advertising imposed by Section 6 prohibits the "dissemination of information with respect to a lawfully sold product * * *"[6] in violation of the First Amendment. It is established that product advertising is less vigorously protected than other forms of speech. Breard v. City of Alexandria, 341 U.S. 622, 642, 71 S.Ct. 920, 95 L.Ed. 1233 (1951); Murdock v. Com. of Pennsylvania, 319 U.S. 105, 110–111, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); Valentine v. Chrestensen, 316 U.S. 52, 54, 62 S.Ct. 920, 86 L.Ed. 1262 (1942); Banzhaf v. Federal Communications Commission, 132 U.S.App. D.C. 14, 405 F.2d 1082, 1101 (1968) cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969). The unique characteristics of electronic communication make it especially subject to regulation in the public interest. National Broadcasting Co. v. United States, 319 U.S. 190, 226–227, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); Office of Communication of United Church of Christ v. Federal Communications Commission, 123 U.S.App.

D.C. 328, 359 F.2d 994, 1003 (1966). Whether the Act is viewed as an exercise of the Congress' supervisory role over the federal regulatory agencies or as an exercise of its power to regulate interstate commerce, Congress has the power to prohibit the advertising of cigarettes in any media. The validity of other, similar advertising regulations concerning the federal regulatory agencies has been repeatedly upheld whether the agency be the FCC,[7] the FTC,[8] or the SEC.[9] Petitioners do not dispute the existence of such regulatory power, but urge that its exercise in context of the Act is unconstitutional. In that regard it is dispositive that the Act has no substantial effect on the exercise of petitioners' First Amendment rights. Even assuming that loss of revenue from cigarette advertisements affects petitioners with sufficient First Amendment interest, petitioners, themselves, have lost no right to speak—they have only lost an ability to collect revenue from others for broadcasting their commercial messages. See, Business Executives' Move For Vietnam Peace v. F. C. C., 450 F.2d 642 at 654 (D.C.Cir. 1971). Finding nothing in the Act or its legislative history which precludes a broadcast licensee from airing its own point of view on any aspect of the cigarette smoking question, it is clear that petitioners' speech is not at issue. Thus, contrary to the assertions made by petitioners, Section 6 does not prohibit them from disseminating information about cigarettes, and, therefore, does not conflict with the exercise of their First Amendment rights.

---

4. Id.

5. Pub.L. 91–222 (April 1, 1970), 15 U.S.C. § 1335.

6. Petition for Permanent Injunction, p. 4.

7. See, New York State Broadcasters Association v. United States, 414 F.2d 990 (2d Cir.), cert. denied, 396 U.S. 1061, 90 S.Ct. 752, 24 L.Ed.2d 755 (1969), upholding the ban on broadcast media of lottery information, 18 U.S.C. § 1034.

8. See, F.T.C. v. Standard Education Soc'y, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141

(1937); Giant Food, Inc. v. F.T.C., 116 U.S.App.D.C. 227, 322 F.2d 977 (1963), cert. dismissed, 376 U.S. 967, 84 S.Ct. 1121, 12 L.Ed.2d 82 (1964), upholding 15 U.S.C. § 45 which empowers the FTC to prevent unfair and deceptive practices, including advertising.

9. See, United States v. Re, 336 F.2d 306 (2d Cir.), cert. denied, 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177 (1964), which upheld the Securities Act of 1933, § 5, as amended by 15 U.S.C. § 77 et seq. which empowers the SEC to regulate information disclosed in the solicitation of stock.

The dissent relies upon Banzhaf v. F. C. C., 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969), for the proposition that since cigarette commercials implicitly state a position on a matter of public importance, such ads are placed within the "core protection" of the First Amendment. As we read this decision, with which we are in full accord, it carefully distinguishes between First Amendment protections as such, and the rather limited extent to which product advertising is tangentially regarded as having some limited indicia of such protection. *Banzhaf, supra,* at 1101–02. The fact that cigarette advertising is covered by the FCC's fairness doctrine [10] does not require a finding that it is to be given full First Amendment protection, especially in light of contrary existing authority. See, Breard v. City of Alexandria; Murdock v. Pennsylvania; Valentine v. Chrestensen, *supra.* We do not understand *Banzhaf* or any other decision which the dissent cites to go that far and we are unwilling to blaze that trail in this case.

■■ Petitioners' Fifth Amendment contention raises a more direct constitutional question. Petitioners state their objection "is *not* that any ban upon cigarette advertising would violate the due process clause. Rather, it is Congress' attempt, in Section 6 of the Act, to classify media in two categories—those prohibited from carrying cigarette advertisements and those who are not—which contravenes the Fifth Amendment because the distinctions drawn are 'arbitrary and invidious.' " [11]

To withstand due process challenge a statutory classification must have a reasonable basis, and if such basis exists, the validity of the statute must be upheld without further inquiry. Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) ; McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) ; United States v. Carolene Products, 304 U.S. 144, 154, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). "[T]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." Williamson v. Lee Optical, 348 U.S. 483, 487–88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). Finally, Congress is entitled to a presumption "that if any state of facts might be supposed that would support its action, those facts must be presumed to exist." International Ass'n of Mach. & A. Workers v. National Mediation Board, 138 U.S.App.D.C. 96, 425 F.2d 527, 540 (1970).

■ Under the above criteria there exists a rational basis for placing a ban on cigarette advertisements on broadcast facilities while allowing such advertisements in print. In 1969 Congress had convincing evidence that the Labeling Act of 1965 had not materially reduced the incidence of cigarette smoking.[12] Substantial evidence showed that the most persuasive advertising was being conducted on radio and television, and that these broadcasts were particularly effective in reaching a very large audi-

---

10. We note in passing that the Fourth Circuit has recently upheld an FCC ruling that "smoking and health" has ceased to be a controversial issue. Larus & Brother Co., Inc. v. F.C.C., 447 F.2d 876 (4th Cir. 1971). It is not necessary at this time, however, to speculate as to any possible effect on the *Banzhaf* holding.

11. Brief in Support of Plaintiffs' Cross-Motion for Summary Judgment, p. 13.

12. Pursuant to Section 5(d) (1) of the Cigarette Labeling and Advertising Act,

the Secretary of Health, Education and Welfare made recommendations to the Congress in his 1968 report which stressed the need for strengthened legislation in the cigarette advertising area. Pursuant to Section 5(d) (2) of the Act, the Federal Trade Commission made three annual reports to the Congress stressing the strength of the smoking habit, the pervasiveness of broadcast commercials and the need for new legislation. H.R.Rep. No. 91–566, 91st Cong., 1st Sess. 3–6 (1969).

ence of young people.[13] Thus, Congress knew of the close relationship between cigarette commercials broadcast on the electronic media and their potential influence on young people, and was no doubt aware that the younger the individual, the greater the reliance on the broadcast message rather than the written word. A pre-school or early elementary school age child can hear and understand a radio commercial or see, hear and understand a television commercial, while at the same time be substantially unaffected by an advertisement printed in a newspaper, magazine or appearing on a billboard.

The fact is that there are significant differences between the electronic media and print. As the Court stated in *Banzhaf,* supra,

> Written messages are not communicated unless they are read, and reading requires an affirmative act. Broadcast messages, in contrast are 'in the air.' In an age of omnipresent radio, there scarcely breathes a citizen who does not know some part of a leading cigarette jingle by heart. * * It is difficult to calculate the subliminal impact of this pervasive propaganda, which may be heard even if not listened to, but it may reasonably be thought greater than the impact of the written word.[14]

Moreover, Congress could rationally distinguish radio and television from other media on the basis that the public owns the airwaves and that licenses must operate broadcast facilities in the public interest under the supervision of a federal regulatory agency. Legislation concerning newspapers and magazines must take into account the fact that the printed media are privately owned. See, National Broadcasting Co. v. United States, supra; Red Lion Broadcasting Co. v. F. C. C., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

Thus, Congress had information quite sufficient to believe that a proscription covering only the electronic media would be an appropriate response to the problem of cigarette advertising. Petitioners emphasize that much of the revenue formerly allocated to television and radio cigarette advertisements has been diverted to newspapers and magazines. The fact that the Act may create a new and perhaps potentially serious situation in the print media is not sufficient evidence to establish a due process violation. The Fifth Amendment does not compel legislatures "to prohibit all like evils, or none. A legislature may hit at an abuse which it has found, even though it has failed to strike at another." United States v. Carolene Products, supra, 304 U.S. at 151, 58 S.Ct. at 783. Speculation concerning the final impact or success of the classification in question cannot erode the valid factual distinctions upon which such classification was predicated.

The petition for injunctive and declaratory relief is, accordingly, denied.

13. The FTC Report of 1967 cited *supra,* n. 12 at 13, presented strong evidence of a great attraction on the part of young people to the broadcast media. Typical of the data is the following: Teenage boys surveyed averaged 4.3 hours of radio listening *daily;* teenage girls surveyed averaged 5.3 hours; in every half-hour segment from 8:00 P.M. until 11:00 P.M. radio delivers a minimum [audience] of 24.1% of all teenagers; and 87.9% of teenage girls hear radio on the average day. The statistics for television were equally impressive. *Id.,* at 5. Among other experts, Congress had the benefit of the testimony of Joseph Cullman, Chairman of Philip Morris, Inc., who stated: " * * * I think further that broadcast is quite different from print media. We think that the print media appeals to a more adult person and as such is a more appropriate place for cigarette ads." Hearings on H.R. 6543 Before the Consumer Subcommittee of the Committee on Commerce, 91st Cong., 1st Sess., at 115 (1969).

14. 132 U.S.App.D.C. 14, 405 F.2d 1082, 1100–1101 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969), (footnote omitted).

J. SKELLY WRIGHT, Circuit Judge (dissenting):

Cigarette smoking and the danger to health which it poses are among the most controversial and important issues before the American public today. Yet Congress, in passing the Public Health Cigarette Smoking Act of 1969,[1] has suppressed the ventilation of these issues on the country's most pervasive communication vehicle—the electronic media.[2] Under the circumstances, in my judgment, no amount of attempted balancing of alleged compelling state interests against freedom of the press can save this Act from constitutional condemnation under the First Amendment. The heavy hand of government has destroyed the scales.

It would be difficult to argue that there are many who mourn for the Marlboro Man or miss the ungrammatical Winston jingles. Most television viewers no doubt agree that cigarette advertising represents the carping hucksterism of Madison Avenue at its very worst. Moreover, overwhelming scientific evidence makes plain that the Salem girl was in fact a seductive merchant of death —that the real "Marlboro Country" is the graveyard.[3] But the First Amendment does not protect only speech that is healthy or harmless. The Court of Appeals in this circuit has approved the view that "cigarette advertising implicitly states a position on a matter of public controversy." Banzhaf v. F. C. C., 132 U.S.App.D.C. 14, 34, 405 F.2d 1082, 1102 (1968), cert. denied, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969). For me, that finding is enough to place such advertising within the core protection of the First Amendment.

I

The Banzhaf case, decided three years ago, upheld an FCC determination that, since cigarette advertising was controversial speech on a public issue, the so-called "fairness doctrine" applied to it.[4] Stations carrying cigarette advertising were therefore required to "tell both sides of the story" and present a fair number of anti-smoking messages.

The history of cigarette advertising since Banzhaf has been a sad tale of well meaning but misguided paternalism, cynical bargaining and lost opportunity. In the immediate wake of Banzhaf, the broadcast media were flooded with exceedingly effective anti-smoking commercials. For the first time in years, the statistics began to show a sustained trend toward lesser cigarette consumption.[5] The Banzhaf advertising not only

---

1. 15 U.S.C.A. §§ 1331–1340 (1971 Pocket Part).

2. The Act provides: "After January 1, 1971, it shall be unlawful to advertise cigarettes on any medium of electronic communication subject to the jurisdiction of the Federal Communications Commission." 15 U.S.C.A. § 1335. In addition, the Act slightly modifies the warning appearing on cigarette packs, see § 1333, prohibits the state from imposing stricter requirements on cigarette advertising and packaging, see § 1334(b), and extends the ban on Federal Trade Commission action against cigarette advertising, see § 1336.

3. See S.Rep. 91–566, 91st Cong., 1st Sess., 21–23 (December 5, 1969) (hereinafter cited as "Senate Report"), and sources cited therein; Federal Trade Commission, Report to Congress Pursuant to the Federal Cigarette Labeling and Advertising Act 33 (June 30, 1969).

4. Because some doubt as to the constitutionality of the fairness doctrine existed at that time, the Banzhaf court actually rested its decision on the broader "public interest" standard which broadcasters are required to meet. See 132 U.S.App.D.C. at 24, 405 F.2d at 1092. However, Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), has now made clear that the fairness doctrine is in fact constitutional. This circuit has thus grounded its subsequent extension of the Banzhaf rule squarely on the fairness doctrine. See Friends of the Earth v. F.C.C., D.C.Cir., 449 F.2d 1164 (decided August 16, 1971).

5. See U. S. Department of Agriculture, Tobacco Situation, September 1971, at 5; Hearing Before the Consumer Subcommittee of the Senate Committee on Commerce, 91st Cong., 1st Sess., at 132 (July 22, 1969) (hereinafter cited as "Senate Hearing").

cost the cigarette companies customers, present and potential; it also put the industry in a delicate, paradoxical position. While cigarette advertising is apparently quite effective in inducing brand loyalty, it seems to have little impact on whether people in fact smoke.[6] And after *Banzhaf*, these advertisements triggered the anti-smoking messages which were having a devastating effect on cigarette consumption. Thus the individual tobacco companies could not stop advertising for fear of losing their competitive position; yet for every dollar they spent to advance their product, they forced the airing of more anti-smoking advertisements and hence lost more customers.

It was against this backdrop that the Consumer Subcommittee of the Senate Committee on Commerce met to consider new cigarette legislation. The legislative prohibition against requiring health warnings in cigarette advertisements[7] had just expired, and the Federal Trade Commission had indicated that it might soon require such warnings if not again stopped by Congress.[8] In addition, the FCC was moving toward rule making which would have removed cigarette advertising from the electronic media.[9] Thus Congress had to decide whether to extend the ban on FTC action and institute a similar restraint against the FCC or, alternatively, to allow the regulatory agencies to move forcefully against cigarette advertisements.

The context in which this decision had to be made shifted dramatically when a representative of the cigarette industry suggested that the Subcommittee draft legislation permitting the companies to remove their advertisements from the air.[10] In retrospect, it is hard to see why this announcement was thought surprising. The *Banzhaf* ruling had clearly made electronic media advertising a losing proposition for the industry, and a voluntary withdrawal would have saved the companies approximately $250,000,000 in advertising costs,[11] relieved political pressure for FTC action,[12] and removed most anti-smoking messages from the air.[13]

At the time, however, the suggestion of voluntary withdrawal was taken by some as a long delayed demonstration of industry altruism.[14] Congress quickly complied with the industry's suggestion by banning the airing of television and radio cigarette commercials. Moreover, the new legislation provided additional rewards for the industry's "altruism" including a delay in pending FTC action against cigarette advertising[15] and a prohibition against stricter state regulation of cigarette advertising and pack-

---

6. *See* J. Simon, Issues in the Economics of Advertising (1969), portions reprinted in Senate Hearing at 108–109; Senate Hearing at 117–118 (testimony of Joseph F. Cullman III, Chairman, Philip Morris, Inc.) ; Note, Cigarette Advertising and the Public Health, 6 Colum. J. of Law & Soc. Prob. 99, 117 (1970).

7. 15 U.S.C. §§ 1334(b) & 1339 (Supp. V 1965–1969).

8. *See* FTC News Release of May 22, 1969, reprinted as Appendix A to Federal Trade Commission, Report to Congress, *supra* Note 3.

9. *See* FCC Notice of Proposed Rule Making, FCC Docket No. 18434, 34 Fed.Reg. 1959 (1969) ; Senate Hearing at 154 (testimony of Rosel H. Hyde, Chairman, FCC).

10. *See* Senate Hearing at 78 (testimony of Mr. Cullman). The cigarette companies requested an antitrust exemption so they could reach an agreement among themselves not to advertise on the electronic media without fear of prosecution for restraint of trade.

11. *See* Senate Report at 9.

12. The Chairman of the FTC had made known his agency's willingness to suspend its proposed requirement of health warnings in all cigarette advertisements if the advertising were removed from the electronic media. *See* Senate Hearing at 172.

13. *See* Senate Hearing at 160–162 (testimony of FCC Chairman Hyde).

14. *See, e. g.,* Senate Hearing at 81 (remarks of Senator Moss).

15. *See* 15 U.S.C.A. § 1336.

aging.[16] The result of the legislation was that as both the cigarette advertisements and most anti-smoking messages left the air, the tobacco companies transferred their advertising budgets to other forms of advertising such as newspapers and magazines where there was no fairness doctrine to require a response.[17]

The passage of the Public Health Cigarette Smoking Act of 1969 marked a dramatic legislative *coup* for the tobacco industry. With the cigarette smoking controversy removed from the air, the decline in cigarette smoking was abruptly halted and cigarette consumption almost immediately turned upward again.[18] Thus whereas the *Banzhaf* ruling, which required that both sides of the controversy by aired,[19] significantly depressed cigarette, sales, the 1969 legislation which effectively banned the controversy from the air, had the reverse effect. Whereas the *Banzhaf* decision had increased the flow of information by air so that the American people could make an informed judgment on the hazards of cigarette smoking, the 1969 Act cut off the flow of information altogether.[20]

Of course, the fact that the legislation in question may be a product of skillful lobbying or of pressures brought by narrow private interests, or may have been passed by Congress to favor a particular industry, does not necessarily affect its constitutionality. *Cf.* United States v. O'Brien, 391 U.S. 367, 383–385, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Arizona v. California, 283 U.S. 423, 455, 51 S.Ct. 522, 75 L.Ed. 1154 (1931). But when the "inevitable effect" of the legislation is the production of an unconstitutional

16. *See* 15 U.S.C.A. § 1334(b).

17. *See* Advertising Age, January 11, 1971, at 2 ("Cigarets' Exit from Airwaves Brings Repercussions Aplenty Among Advertisers, Media"); Media Decisions, January 1971, at 10 ("Cigarettes in Newspapers").

18. The figures on total U.S. cigarette consumption from 1967 to the present are quite striking. U.S. consumption reached a peak of 549.2 billion cigarettes in 1967, the year before the *Banzhaf* ruling. As the *Banzhaf* messages began to appear on the air in late 1968, consumption began to drop for the first time in two years. It slipped to 545.7 billion in 1968 and 528.9 billion in 1969. Cigarette commercials and most *Banzhaf* messages left the air on January 1, 1970, and their departure was accompanied by an immediate resumption of the upward trend in consumption. 536.4 billion cigarettes were consumed in the United States in 1970 and the projected figure for 1971 is 546.0 billion. Tobacco Situation, *supra* Note 5, at 5. The Department of Agriculture has concluded that "U. S. consumption of cigarettes in calendar 1971 likely will gain 2 percent over 1970. * * * Per capita use is steadying after declines for the past 4 years. With prospects for these factors to continue in 1972, cigarette consumption may again show a small gain." *Id.* at 4. These gains in cigarette consumption are reflected, in turn, in a resumption of prosperous conditions in the cigarette industry. *See* Advertising Age, May 31, 1971, at 1 ("Cigaret stocks, Wrigley pace '71 advertiser issues"); Advertising Age, May 10, 1971, at 91 ("Is cigaret companies' success without tv giving others ideas?").

19. *Banzhaf* had required broadcasters carrying cigarette messages to carry the anti-smoking messages free of charge under certain circumstances. With the removal of cigarette advertising, only those anti-smoking groups who could afford to buy time or who succeeded in persuading broadcasters to donate it remained on the air. *See* Senate Hearing at 160–162 (testimony of FCC Chairman Hyde).

20. Some of the language in *Banzhaf* makes clear just how far removed the Public Health Cigarette Smoking Act of 1969 is from the spirit which informed that ruling. The *Banzhaf* court argued:

"* * * [I]f we are to adopt petitioners' analysis, we must conclude that Congress legislated to curtail the potential flow of information lest the public learn too much about the hazards of smoking for the good of the tobacco industry and the economy. We are loathe [sic] to impute such a purpose to Congress absent a clear expression. *Where a controversial issue with potentially grave consequences is left to each individual to decide for himself, the need for an abundant and ready supply of relevant information is too obvious to need belaboring.*"

132 U.S.App.D.C. at 21, 405 F.2d at 1089. (Emphasis added.)

result, the statute cannot be allowed to stand. *See* Gomillion v. Lightfoot, 364 U.S. 339, 342, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). The legislative history related above shows that the effect of this legislation was to cut off debate on the value of cigarettes just when *Banzhaf* had made such a debate a real possibility. The theory of free speech is grounded on the belief that people will make the right choice if presented with all points of view on a controversial issue. *See* Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 881 (1963); A. Meiklejohn, Political Freedom 26–28 (1960). When *Banzhaf* opened the electronic media to different points of view on the desirability of cigarette smoking, this theory was dramatically vindicated. Once viewers saw both sides of the story, they began to stop or cut down on smoking in ever increasing numbers.[21] Indeed, it was presumably the very success of the *Banzhaf* doctrine in allowing people to make an informed choice that frightened the cigarette industry into calling on Congress to silence the debate.

## II

This is not an ordinary "free speech" case. It involves expression which is ostensibly apolitical, advocating a particularly noxious habit through a medium which the Government has traditionally regulated more extensively than other modes of communication. But the unconventional aspects of the problem should not distract us from the basic First Amendment principles involved. Any statute which suppresses speech over any medium for any purpose begins with a presumption against its validity.

If the Government is able to come forward with constitutionally valid reasons why this presumption should be overcome, then of course the statute will be allowed to stand. But where, as here, the reasons offered are inconsistent with the purposes of the First Amendment, it becomes the duty of the courts to invalidate the statute.

Thus it may be true, as the Government argues, that the special characteristics of the electronic media justify greater governmental regulation than would be permitted for the print media. *See* National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L. Ed. 1344 (1943). But such regulation is constitutionally justified only because it serves to apportion access to the media fairly. As Mr. Justice Frankfurter argued in *National Broadcasting:*

" * * * Freedom of utterance is abridged to many who wish to use the limited facilities of radio. Unlike other modes of expression, radio inherently is not available to all. That is its unique characteristic, and that is why, unlike other modes of expression, it is subject to governmental regulation. * * * But Congress did not authorize the Commission to choose among applicants upon the basis of their political, economic or social views, or upon any other capricious basis. If it did, or if the Commission by these Regulations proposed a choice among applicants upon some such basis, the issue before us would be wholly different. * * * *"[22]

Cases such as *Red Lion*,[23] *Banzhaf*, and *United Church of Christ*[24] are consistent with this approach in that they uphold Government power to insure wid-

---

21. *See* Notes 5 & 18, *supra.*

22. National Broadcasting Co. v. United States, 319 U.S. 190, 226, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943). For a criticism of this "scarcity" rationale as a justification for even limited governmental interference, *see* Robinson, The FCC and the First Amendment: Observations on 40 Years of Radio and Television Regulation, 52 Minn.L.Rev. 67 (1967).

23. Red Lion Broadcasting Co. v. F.C.C., *supra* Note 4.

24. Office of Communication of United Church of Christ v. F.C.C., 123 U.S.App. D.C. 328, 359 F.2d 994 (1966), order entered after remand, 138 U.S.App.D.C. 112, 425 F.2d 543 (1969).

er access to the means of communication and persuasion. But these decisions in no way serve as precedent for the use of Government power to shut off debate on a vital public issue. If the First Amendment means anything at all, it means that Congress lacks this power. There is no constitutional warrant for Government censorship of any medium of communication. Compare United States v. Paramount Pictures, 334 U.S. 131, 166, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), with Citizens Communication Center v. F. C. C., D.C. Cir., 447 F.2d 1201, at 1213, (decided June 11, 1971).

Thus the Government fails to meet its burden by simply asserting broad regulatory power over the broadcast media. If the statutory ban on cigarette advertising is to withstand constitutional scrutiny, there must be a further showing that either the advertising is not speech within the meaning of the First Amend-

ment or it creates a clear and present danger of such substantial magnitude that governmental suppression is justified.[25] While the Government in fact makes both of these arguments, I find neither of them persuasive in the context of this case.

Although the status of commercial or "product" advertising under the First Amendment has not been finally resolved,[26] it must be conceded that some cases seem to accord it lesser protection than political or artistic speech.[27] Indeed, as the court in *Banzhaf* stated: "As a rule, [product advertising] does not affect the political process, does not contribute to the exchange of ideas, does not provide information on matters of public importance, and is not, except perhaps for the ad-men, a form of individual self-expression." [28] Commentators too have argued that product advertising is generally unrelated to the values

25. The majority suggests that the statute can be upheld because "petitioners [the broadcasters], themselves, have lost no right to speak—they have only lost an ability to collect revenue from others for broadcasting their commercial messages." But this argument misconceives the nature of the issues involved. As Mr. Justice White stated in Red Lion Broadcasting Co. v. F.C.C., *supra* Note 4:

"* * * It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount. * * It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee. * * * It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged either by Congress or by the FCC."

395 U.S. at 390, 89 S.Ct. at 1806. *See also* Business Executives' Move for Vietnam Peace v. F.C.C., 450 F.2d 642, at 654 (decided August 3, 1971). *Cf.* New York Times Co. v. Sullivan, 376 U.S. 254, 265–266, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), where the Supreme Court rejected the notion that a newspaper lacked standing to assert the First Amendment interests of its advertisers.

26. *See* Cammarano v. United States, 358 U.S. 498, 513–514, 79 S.Ct. 524, 3 L.Ed. 2d 462 (1959) (Mr. Justice Douglas, concurring).

27. *See, e. g.,* Breard v. Alexandria, 341 U.S. 622, 626, 71 S.Ct. 920, 95 L.Ed. 1233 (1951); Donaldson v. Read Magazine, 333 U.S. 178, 191, 68 S.Ct. 591, 92 L.Ed. 628 (1948); Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942).

28. 132 U.S.App.D.C. at 33–34, 405 F.2d at 1101–1102. While these words were written in a context involving cigarette advertising, they cannot be cited for the proposition that cigarette messages fall outside the protection of the First Amendment. Indeed, in the very same paragraph the court went on to say: "In the instant case, this argument is not dispositive because the cigarette ruling [applying the fairness doctrine] was premised on the fact that cigarette advertising implicitly states a position on a matter of public controversy." *Ibid.* The *Banzhaf* court seems to have rejected petitioners' First Amendment argument principally because "[t]he cigarette ruling does not ban any speech," and because "the First Amendment gain is greater than the loss." *Ibid.* Neither of these arguments is open to the Government in this case.

which the First Amendment was designed to preserve, and that broad state regulation should therefore be permitted.[29]

These arguments are no doubt persuasive when applied to most of the activities of Madison Avenue. But it does not follow from their general validity that the words "product advertising" are a magical incantation which, when piously uttered, will automatically decide cases without the benefit of further thought.[30] Thus when commercial speech has involved matters of public controversy,[31] or artistic expression,[32] or deeply held personal beliefs,[33] the courts have not hesitated to accord it full First Amendment protection.

In my view, this circuit's decisions in *Banzhaf* and Friends of the Earth v. F.C.C. [34] implicitly recognize this special status which certain forms of product advertising enjoy. Both *Banzhaf* and *Friends of the Earth* suggest that the fairness doctrine is not relevant to normal commercial messages.[35] Yet the doctrine was applied in the case of cigarette and automobile advertisements be-

cause they, unlike ordinary commercial speech, were controversial statements on important public issues. It can hardly be contended that cigarette commercials are "controversial speech" for purposes of the First Amendment based fairness doctrine, yet mere "product advertising" for purposes of the First Amendment.[36] The *Banzhaf* court recognized that the desirability of cigarette smoking had become a vital question of public concern, and that cigarette advertisements were a part of the debate surrounding that question. The court then went on to hold that "[w]here a controversial issue with potentially grave consequences is left to each individual to decide for himself, the need for an abundant and ready supply of relevant information is too obvious to need belaboring." [37]

Indeed, the desirability of cigarette smoking has become still more controversial since *Banzhaf* was decided. Issues such as whether Congress should end price supports for tobacco, require stricter health warnings, or even outlaw the sale of cigarettes altogether are matters of widespread public debate. The Sur-

29. *See* Note, Freedom of Expression in a Commercial Context, 78 Harv.L.Rev. 1191, 1192–1195 (1965).

30. *See* Developments in the Law—Deceptive Advertising, 80 Harv.L.Rev. 1005, 1027–1038 (1967).

31. *See, e. g.,* New York Times Co. v. Sullivan, *supra* Note 25, 376 U.S. at 265–266, 84 S.Ct. 710; *cf.* Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

32. *See, e. g.,* Smith v. California, 361 U.S. 147, 150, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959).

33. *See, e. g.,* United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944).

34. D.C.Cir., 449 F.2d 1164 (decided August 16, 1971).

35. *Cf. id.,* at 1169, 1170; 132 U.S.App.D.C. at 31, 405 F.2d at 1099.

36. It might be argued that the Public Health Cigarette Smoking Act bars only

product advertising and not the sort of general argument about the desirability of cigarette smoking which the First Amendment would protect. But such an argument ignores the full force of the *Banzhaf* decision. The *Banzhaf* court did not rely on general "political" messages favoring smoking to trigger the fairness doctrine. Rather, it found that the product advertising itself "implicitly states a position on a matter of public controversy." 132 U.S.App.D.C. at 34, 405 F.2d at 1102. Moreover, the *Banzhaf* court conceded that "the anti-cigarette broadcasts required by the Commission's ruling may include uninformative propaganda as well as hard information." 132 U.S.App.D.C. at 22 n. 25, 405 F.2d at 1090 n. 25. The First Amendment does not permit the Government to restrict one side of a controversy to "hard information" while allowing the other side to utilize "uninformative propaganda" as well.

37. 132 U.S.App.D.C. at 21, 405 F.2d at 1089.

geon General has stated [38] and reiterated [39] his official position that the health hazards of cigarette smoking make it an undesirable habit. The Government is, of course, entitled to take that position and to attempt to persuade the American people of its validity. But the Government is emphatically not entitled to monopolize the debate or to suppress the expression of opposing points of view on the electronic media by making such expression a criminal offense.[40]

Of course, it is true that the courts have on occasion recognized a narrow exception to these general First Amendment principles. Where otherwise protected speech can be shown to present a "clear and present danger" of a severe evil which the state has a right to prevent, suppression of that speech has on occasion been permitted.[41] The argument is made here that the state has an overwhelming interest in the preservation of the health of its citizens and that cigarette advertising poses a clear and present danger to this interest.

Although this argument is superficially attractive, it cannot withstand close scrutiny. The clear and present danger test has always been more or less confined to cases where the state has asserted an overriding interest in its own preservation or in the maintenance of public order.[42] While it cannot be denied that public health is also a vital area of state concern, it is different from the state interest in security in one crucial respect. Whereas there are always innocent victims in riots and revolutions, the only person directly harmed by smoking cigarettes is the person who decides to smoke them. The state can stop speech in order to protect the innocent bystander, but it cannot impose silence merely because it fears that people will be convinced by what they hear and thereby harm themselves. As cases like Stanley v. Georgia [43] and Griswold v. Connecticut [44] make clear, the state has no interest at all in what people read, see, hear or think in the privacy of their own home or in front of their own television set. At the very core of the First Amendment is the notion that people are capable of making up their own minds about what is good for them and that they can think their own thoughts so long as they do not in some manner interfere with the rights of others.

### III

This opinion is not intended as a Magna Carta for Madison Avenue. In my view, Congress retains broad power to deal with the evils of cigarette advertising. It can force the removal of decep-

---

38. *See* Report of the Surgeon General's Advisory Committee (January 11, 1964).

39. *See* Report on Current Information on the Health Consequences of Smoking (1967).

40. *See* 15 U.S.C.A. § 1338.

41. *See, e. g.,* Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919); Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

42. *Compare, e. g.,* Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951), *with* Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). For a general history of the clear and present danger test, *see* McKay, The Preference for Freedom, 34 N.Y.U.L.Rev. 1182, 1203–1212 (1959).

If the purchase and sale of cigarettes were illegal under state or federal law, the constitutional validity of the Public Health Cigarette Smoking Act of 1969 would, of course, be tested by other First Amendment considerations not relevant here. *Cf.* Camp-of-the-Pines Inc. v. New York Times Co., 184 Misc. 389, 53 N.Y.S. 2d 745 (1945). Since cigarette advertising advocates conduct which at present is entirely legal, it cannot be said that regulation of such advertising is a necessary incident to congressional control of illicit conduct. *See* Note, Freedom of Expression in a Commercial Context, *supra* Note 29, 78 Harv.L.Rev. at 1196. *Cf.* Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

43. 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

44. 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

tive claims, require manufacturers to couple their advertisements with a clear statement of the hazardous nature of their product, and provide for reply time to be awarded to anti-cigarette groups. But the one thing which Congress may not do is cut off debate altogether.

The only interest which might conceivably justify such a total ban is the state's interest in preventing people from being convinced by what they hear—the very sort of paternalistic interest which the First Amendment precludes the state from asserting. Even if this interest were sufficient in the purely commercial context, the *Banzhaf* decision makes clear that cigarette messages are not ordinary product advertising but rather speech on a controversial issue of public importance—*viz.*, the desirability of cigarette smoking. The Government simply cannot have it both ways. Either this is controversial speech in the public arena or it is not. If it is such speech, then Section 6 of the Public Health Cigarette Smoking Act is unconstitutional; if it is not, then *Banzhaf* was wrongly decided. Although I respect the opinion of my colleagues in this case, my own view is that the *Banzhaf* decision was correct and that this law is unconstitutional.[45] I come to that position not only because *stare decisis* dictates it, but also because I think that when people are given both sides of the cigarette controversy, they will make the correct decision. That,

after all, is what the First Amendment is all about. And our too brief experience with the *Banzhaf* doctrine shows that the theory works in practice.

I respectfully dissent.

45. The recent case of Larus & Brother Co., Inc. v. F.C.C., 4 Cir., 447 F.2d 876 (decided August 20, 1971), is not opposed to this view. In a fairness doctrine context that case held that it was *rational* for the Commission to conclude that the health hazard posed by cigarette smoking was no longer a controversial issue. In contrast, we are called upon here to determine *de novo* whether there is *actually* sufficient controversy surrounding cigarette smoking to bring it within the core protection of the First Amendment. Many believe that cigarette smoking does not justify the health risk involved. But the millions of smokers who continue to use cigarettes despite their knowledge of the health hazard have apparently reached precisely the opposite conclusion. Under the circumstances to suggest, as the majority apparently does, that no controversy exists concerning cigarette smoking is to blink reality. What *Larus & Brother Co.* actually demonstrates is that the Public Health Cigarette Smoking Act of 1969 has so succeeded in suppressing ventilation of the cigarette smoking controversy on radio and television that the controversy has disappeared from the electronic media. Thus while the functioning of the First Amendment as to this controversy has been frustrated on the nation's most pervasive information outlets, the controversy itself has in no sense ended. Rather, it has merely been shifted to other communications media where the fairness doctrine is not applicable and cigarette foes have no right of reply. *See* Note 17, *supra.*