357 F.Supp. 20 (1973)
HOLIDAY MAGIC, INC., et al., Plaintiffs,
v.
Robert W. WARREN et al., Defendants.
Civ. A. No. 71-C-659.
United States District Court, E. D. Wisconsin.
April 3, 1973.
*21 *22 David L. Walther, Milwaukee, Wis., for plaintiffs.
Bruce A. Craig, Asst. Atty. Gen., Madison, Wis., for defendants Robert W. Warren and Donald E. Wilkinson.
Joseph E. Tesch, Asst. Dist. Atty., Milwaukee, Wis., for defendant E. Michael McCann.

OPINION AND ORDER
REYNOLDS, District Judge.
The question in this litigation is whether Wisconsin may prohibit the promotion of a chain distributor or "pyramid" scheme without running afoul of certain provisions of the federal Constitution. Jurisdiction arises under 28 U.S.C. §§ 1331 and 1343(3). The *23 plaintiff corporations are charged with employing such a scheme. Together with an individual plaintiff they have moved for the convening of a three-judge court to declare unconstitutional Ag 122, a general order of the Wisconsin Department of Agriculture, and to enjoin its further enforcement. Defendant state officials have opposed that request and have moved to dismiss. The motions for the convening of a three-judge court and to dismiss were briefed and argued together. I have concluded that the federal constitutional claims are insubstantial. This conclusion prohibits me from requesting the convening of a three-judge court and requires me to dismiss the complaint for want of jurisdiction. Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933).
The alleged constitutional defects in Ag 122 are that it violates freedom of speech, that it fails to give adequate notice of the conduct prohibited, that it constitutes an undue burden on interstate commerce, that it intrudes into an area pre-empted by the federal government, that it violates plaintiffs' right to work, that it impairs the obligation of contracts, that it bears no rational relation to a valid state purpose, and that it results in discriminatory enforcement. The general order provides:
"Ag 122.01 Unfair trade practice. The promotional use of a chain distributor scheme in connection with the solicitation of business investments from members of the public is an unfair trade practice under section 100.20, Wis.Stats. When so used the scheme serves as a lure to improvident and uneconomical investment. Many small investors lack commercial expertise and anticipate unrealistic profits through use of the chance to further perpetuate a chain of distributors, without regard to actual market conditions affecting further distribution and sale of the property purchased by them or its market acceptance by final users or consumers. Substantial economic losses to participating distributors have occurred and will inevitably occur by reason of their reliance on perpetuation of the chain distributor scheme as a source of profit.
"Ag 122.02 Definitions. (1) `Chain distributor scheme' is a sales device whereby a person, upon a condition that he make an investment, is granted a license or right to recruit for profit one or more additional persons who also are granted such license or right upon condition of making an investment and may further perpetuate the chain of persons who are granted such license or right upon such condition. A limitation as to the number of persons who may participate, or the presence of additional conditions affecting eligibility for the above license or right to recruit or the receipt of profits therefrom, does not change the identity of the scheme as a chain distributor scheme.
"(2) `Investment' is any acquisition, for a consideration other than personal services, of personal property, tangible or intangible, for profit or business purposes, and includes, without limitation, franchises, business opportunities and services. It does not include real estate, securities registered under chapter 551, Wis. Stats., or sales demonstration equipment and materials furnished at cost for use in making sales and not for resale.
"(3) `Person' includes partnerships, corporations and associations.
"Ag 122.03 Prohibition. No person shall promote, offer or grant participation in a chain distributor scheme.
"Ag 122.04 Statutory exemption. This chapter does not apply to banks, savings and loan associations, insurance companies and public utilities to the extent exempted from department regulations under section 93.01(13), Wis.Stats."
The general order was issued pursuant to authority vested in the Department of *24 Agriculture by § 100.20 of the Wisconsin Statutes which provides in part:
"Methods of competition and trade practices. (1) Methods of competition in business and trade practices in business shall be fair. Unfair methods of competition in business and unfair trade practices in business are hereby prohibited.
"(2) The department, after public hearing, may issue general orders forbidding methods of competition in business or trade practices in business which are determined by the department to be unfair. * * *
* * * * * *
"(6) The department may commence an action in circuit court in the name of the state to restrain by temporary or permanent injunction the violation of any order issued under this section. * * *"
Violating an order issued under § 100.20 subjects a person to a fine of not less than $25 nor more than $5,000 and to imprisonment of not more than one year. Wis.Stats. § 100.26(3). Violating an injunction issued pursuant to § 100.20(6) subjects a person to a civil forfeiture of not less than $100 nor more than $10,000. Wis.Stats. § 100.26(6).

THE FIRST AMENDMENT
The alleged First Amendment violation lies in prohibiting the mere "promotion" of a chain distributor scheme. Promotion alone, plaintiffs argue, may involve only speech. Consequently, the argument goes, the state may not restrict it without showing that it urges imminent lawless action of an extremely serious nature. Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941).
Past opinions of the United States Supreme Court make the decision of the First Amendment claim as easy to reach as it is difficult to justify. In an unbroken line of decisions the Supreme Court, and lower courts as well, have distinguished between the expression protected by the First Amendment and the use of speech, whether truthful or not, in a commercial context like that presented here. Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). Compare Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L. Ed. 1233 (1951), with Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943). See New York State Broadcasters Ass'n v. United States, 414 F.2d 990 (2d Cir. 1969), cert. denied, 396 U.S. 1061, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); Banzhaf v. Federal Communications Commission, 132 U.S.App. D.C. 14, 405 F.2d 1082 (1968), cert. denied sub nom., Tobacco Institute, Inc. v. Federal Communications Commission, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969); Capital Broadcasting Co. v. Mitchell, 333 F.Supp. 582 (D.D.C.1971), (three-judge court), aff'd sub nom., Capital Broadcasting Co. v. Acting Attorney General, 405 U.S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972); Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Cf. United States v. Mitchell, 327 F.Supp. 476 (N.D.Ga.1971); United States v. Bob Lawrence Realty, Inc., 313 F.Supp. 870 (N.D.Ga.1970); United States v. Mintzes, 304 F.Supp. 1305 (D.Md.1969); United States v. Hunter, 459 F.2d 205 (4 Cir., 1972).[1]
As commentators have noted, the rationale for the distinction is seldom *25 made explicit, and the tests for distinguishing between commercial and noncommercial expression would never survive evenhanded application. Developments in the LawDeceptive Advertising, 80 Harv.L.Rev. 1005, 1027-1038 (1967); Note, Freedom of Expression in a Commercial Context, 78 Harv.L.Rev. 1191 (1965); Dun & Bradstreet, Inc. v. Grove, Trustee et al., 404 U.S. 898, 904, 92 S.Ct. 204, 30 L.Ed.2d 175 (1971) (Douglas, J., dissenting). For example, the original test implied in Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), considered commercial all expression made for the primary purposes of commercial gain. See Resnick, Freedom of Speech and Commercial Solicitation, 30 Cal.L.Rev. 655 (1942). Yet commercial gain is no doubt the primary purpose of many involved in labor disputes and of innumerable authors, journalists, dramatists, and others who earn their livelihood through expression that is unquestionably entitled to First Amendment protection. Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); cf. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). Even if the expression of professional writers is considered noncommercial, despite the commercial purpose, on the ground that the gain arises from selling the expression itself rather than from using the expression to sell some other product, the expression of those, for example, who advertise to raise funds for a political purpose would still have to be considered commercial under the "primary purpose" test. Yet in New York Times, Inc. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court granted First Amendment protection to political advertisements, noting that neither the desire to raise funds nor the commercial form of the expression dictated a contrary result. Instead the opinion in New York Times implied a new ground for identifying commercial expression and denying it protection; namely, that it dealt exclusively with matters of private rather than public concern. 376 U. S. at 266, 84 S.Ct. 710. See also Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). But it is apparent that informative commercial expression dealing with, for example, the safety, cost, and quality of consumer products or, as in this case, the wisdom of possible investments, involves matters of public concern. See Banzhaf v. Federal Communications Commission, 132 U.S. App.D.C. 14, 405 F.2d 1082 (1968). The concern about the characteristics of products and investments is often more widespread than the concern about labor disputes; individuals will often better develop their capacity to govern themselves and influence their society by evaluating a sales pitch than by reading the crime-oriented magazines and comics granted protection in other cases. See Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1947); Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945). See also Meiklejohn, The First Amendment Is An Absolute, 1961 Sup.Ct.Rev. 245; Radish, The First Amendment in the Marketplace; Commercial Speech and the Value of Free Expression, 39 Geo.Wash.L.Rev. 429 (1971).
Despite the conceptual difficulties in articulating a test to distinguish commercial from noncommercial expression, the decision to deny protection to commercial expression reflects the Supreme Court's sound judgment about the function of the First Amendment. Put simply, the use of speech to sell products or promote commercial ventures bears little, if any, relation to the discussion of politics, religion, philosophy, art, and other more mundane subjects which the Supreme Court believes the First Amendment was historically designed to protect. See Kalven, The New York Times Case: A Note on "The Central Meaning of the First Amendment," 1964 Sup.Ct.Rev. 191; Brennan, The Supreme Court and the Meiklejohn Interpretation of the First Amendment, *26 79 Harv.L.Rev. 1 (1965); Meiklejohn, Political Freedom (New York, Harper and Row, 1960); Emerson, The System of Free Expression 414 (1970); Emerson, Toward A General Theory of the First Amendment, 72 Yale L.J. 877, 948-949 n. 93 (1963). Where the government is often barred from interfering with an individual's free choice on those subjects where expression is protected, it has taken an active role in regulating individual behavior in the commercial marketplace. West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937); Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1935). That commercial activity takes the form of speech does not necessarily immunize it from regulation.[2] Just as solicitation of murder is regulable, though only speech is involved, so is the promotion of an unlawful commercial activity. In both cases the speech is inseparably related to the particular unlawful activity and not remotely related to the suggested purposes of the First Amendment. See Emerson, Toward a General Theory of the First Amendment, 72 Yale 877-886 (1963). By comparison, advocating the social benefits of pyramiding schemes in general in order to change the law is protected. But such advocacy designed to obtain the political support of others is easily distinguishable from the solicitation designed to obtain their immediate financial participation. In this case, the word "promote" is amenable to a construction prohibiting only the expression used in the actual organization, advertisement, or implementation of the prohibited schemes. See Zwickler v. Koota, 389 U.S. 241, 249, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Harrison v. N. A.A.C.P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959).

VAGUENESS
Fundamental fairness requires that people be given notice of the conduct the law proscribes. Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1925). But it does not require that regulations prescribe conduct with absolute or mathematical precision, nor does it require that there never be disagreement on the application of the regulation to particular factual situations. United States v. Wurzbach, 280 U.S. 396, 50 S.Ct. 167, 74 L.Ed. 508 (1929); United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877 (1946). Vagueness is not a wooden concept but a flexible one, based on a common sense evaluation of the notice given by a regulation and calling for consideration of the entire text, the subject matter dealt with, and the difficulty in being more precise. Winters v. New York, 333 U.S. 507, 524-525, 68 S.Ct. 665, 92 L.Ed. 840 (1947). The alleged vagueness of Ag 122 lies in the inherent ambiguity of the words "promote" and "scheme" in § 122.03 and the words "investment," *27 "recruiting for profit," and "additional conditions affecting eligibility" in § 122.02. Plaintiffs suggest hypothetical factual situations where the application of those words and, hence, of the regulation is uncertain. But, as mentioned above, that does not make the regulation unconstitutionally vague. If it did, statutory interpretation would never be necessary.
Section 122.03, the only prohibitive section, states that no person shall "promote, offer or grant participation in a chain distributor scheme." The words "promote, offer or grant participation in" indicate that the prohibition extends to any efforts to involve others in the scheme. The scheme itself is defined in § 122.02(1) as "a sales device whereby a person, upon a condition that he make an investment, is granted a license or right to recruit for profit one or more additional persons who also are granted such license or right * * * upon such condition." The words "investment" and "person" used in defining chain distributor schemes are in turn defined in § 122.02(2) and (3). I believe the regulation gives a man of common intelligence a sufficiently definite idea of what is proscribed. Though comparison with other statutes is of dubious value, see Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67 (1960), the regulation is certainly more definite than the Sherman Antitrust Act which prohibits all "contracts * * * in restraint of trade or commerce" and which was held sufficiently definite by Justice Holmes in Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1913). See 15 U.S.C.A. § 1 et seq. (1962). Plaintiffs' contention that the regulation is unconstitutionally vague is insubstantial.

BURDEN ON INTERSTATE COMMERCE
Though a state has wide-ranging authority under its police power to enact all laws furthering the interests of its citizens, it cannot enact laws which discriminate against or unduly burden interstate commerce. United States Constitution, Art. I, § 8. Plaintiffs cannot contend that Ag 122 discriminates against interstate commerce for by its terms it applied evenhandedly to all chain distributor schemes within the state, whether intrastate or interstate in character. Prohibiting the use of commercial schemes, moreover, cannot be compared with burdening the interstate movement of trucks and trains engaged in admittedly lawful commercial activities. Compare Cooley v. Board of Wardens of the Port of Philadelphia, 12 How. 299, 13 L.Ed. 996 (1851), with Southern Pacific Co. v. Arizona, 325 U. S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945), and South Carolina State Highway Dept. v. Barnwell Bros., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938). Ag 122 in no way inhibits plaintiffs' use of the schemes in other states. Cf. Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959). Finally, a state's interest in protecting its citizens against fraud or other unlawful business practices has a prominence which would warrant upholding the regulation even if it had a considerable impact on interstate activities. See H. P. Hood & Sons v. DuMond, 336 U.S. 525, 533, 69 S.Ct. 657, 93 L.Ed. 865 (1949); Hygrade Provision Co. v. Sherman, 266 U.S. 497, 45 S.Ct. 141, 69 L.Ed. 402 (1925). Justice Stewart recently set forth the proper approach in deciding whether regulations like Ag 122 violate the commerce clause:
"* * * Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. * * *" Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). *28 Thus far plaintiffs have not indicated in what way Ag 122 imposes any burden on interstate commerce. Accordingly, plaintiffs' contention that it is unconstitutional on that ground is insubstantial.

PRE-EMPTION
Plaintiff Holiday Magic, Inc., states that it has been charged by the Federal Trade Commission with several counts of violating section 5 of the Federal Trade Commission Act of 1934, as amended, which provides:
"Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful." 15 U.S.C.A. § 45(a)(1).
See In the Matter of Holiday Magic, Inc. et al., Federal Trade Commission, Docket No. 8834. Holiday Magic, Inc., then contends that by taking this action the Federal Trade Commission has preempted Wisconsin from enforcing Ag 122 and, it would follow from plaintiffs' argument, from enforcing any general order issued pursuant to Wis.Stats. § 100.20.
In passing the Federal Trade Commission Act, Congress certainly did not intend to bar states from stopping unfair business practices which might injure their own citizens. Indeed the Act which authorized the Federal Trade Commission to proceed against unfair practices committed in interstate commerce impliedly encouraged states to develop their own laws. Today "little FTC Acts" and other state laws prohibiting unfair practices are in force in more than two-thirds of the states. See, e. g., 9 Vt.S.A. § 2453 et seq. (1971). As Justice Brennan found in Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 141, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), where a California statute barred out of state avocados which did not meet state standards, there is "neither such actual conflict between the two schemes of regulation that both cannot stand in the same area, nor evidence of a congressional design to pre-empt the field."
However, Holiday Magic, Inc., does not claim that the "field" of unfair business practices has been preempted. It admits that the state has coordinate authority with the federal government to deal with unfair practices and may generally enforce Ag 122. But it asserts that when as here the Federal Trade Commission has begun an action against the same company that the state seeks to enjoin, the Federal Trade Commission has exclusive jurisdiction until the action it began is resolved. This assertion is plainly incorrect. Since Congress in enacting the Federal Trade Commission Act left the states free to establish their own standards and penalties for unfair practices, there is no reason why the outcome of the suit brought by the Federal Trade Commission would have any bearing on plaintiffs' liability under state law. It is well settled that when the same act by an individual violates both state and federal law, both the state and the federal government may act without waiting for the other to finish.
In addition, plaintiff has not shown that the Federal Trade Commission is suing it for the same acts that Wisconsin attacks. Being sued by the Federal Trade Commission for certain practices surely does not immunize one during the many months in which the suit is pending from state actions brought to enjoin other practices.

RIGHT TO WORK
Plaintiff Dale Schmidt contends that the regulation deprives him of his constitutional right to work at his chosen occupation. To illustrate his right to work, plaintiff cites authorities holding that an individual may not be denied the opportunity to work in a lawful vocation because of his beliefs or his exercise of First Amendment rights. Cohen v. Hurley, 366 U.S. 117, 81 S.Ct. 954, 6 L.Ed.2d 156 (1961); Peters v. *29 Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L. Ed. 1129 (1955); Barsky v. Board of Regents of New York, 347 U.S. 442, 74 S.Ct. 650, 98 L.Ed. 829 (1954). But the right not to be barred from a lawful vocation for an unlawful reason does not imply the right to work at what the legislature deems a vocation inimical to the public interest. Plaintiff may respond with Falstaff who met the charge of "purse-taking" with the answer, "But 'tis my vocation Hal, 'tis no sin for a man to labor in his vocation." Henry the Fourth, Part I, Act I, sc. II, lines 116-117. But sin or not, nothing in the Constitution prevents a state from outlawing activities because others have profited from them in the past. Nor must a regulation affecting previous vocations be supported by a more compelling state interest than that supporting any other regulation. Plaintiff's reliance on his right to work does not state a claim on which relief can be granted.

IMPAIRMENT OF CONTRACTS AND DUE PROCESS
The allegations that Ag 122 impairs the obligations of contracts and bears no reasonable relation to a valid state purpose may be treated together. Historically designed to bar states from arbitrarily relieving debtors from their contracts, the contract clause has long been interpreted to prevent it from being an inflexible barrier to public regulation. In Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934), a decision upholding the Minnesota mortgage moratorium law which postponed foreclosure sales and extended the period for redemption of mortgages, Chief Justice Hughes reiterated that state laws reasonably related to a valid state purpose would not be held unlawful because they have incidental effects on contracts created in the past:
"Not only is the [contract clause] qualified by the measure of control which the state retains over remedial processes, but the state also continues to possess authority to safeguard the vital interests of its people. * * * Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while,  a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court.
* * * * * *
"* * * The states retain adequate power to protect the public health against the maintenance of nuisances despite insistence upon existing contracts. * * *" 290 U.S. at 434-436, 54 S.Ct. at 238-239.
In this case those in the chain who had already paid for the right to recruit others obviously had the value of their contract impaired when Ag 122 was issued. The question then becomes whether Ag 122 was reasonably related to a valid state purpose.
To show that Ag 122 is not reasonably related to a valid state purpose, plaintiffs must overcome the presumption of the constitutionality which all regulations of commercial activity enjoy. Moreover, the ordinary presumption that the regulation bears a reasonable relation to the public interest is buttressed by the regulation's preamble, § 122.01, in which the Department set forth the facts which led it to believe that prohibiting chain distributor schemes would serve the public interest.
Although plaintiffs state in their brief that at trial they will show that the facts set forth in the preamble are incorrect and that there is no legitimate reason for prohibiting the use of chain distributor schemes, they have not *30 indicated by way of affidavits, detailed allegations in the complaint, assertions of counsel, or otherwise what the nature of these facts would be. Instead they rely upon their conclusory allegations in the complaint that the general order is irrational, but in the context of this case, such allegations alone do not justify requesting a three-judge court.

DENIAL OF EQUAL PROTECTION
Plaintiffs' final contention is that the regulation results in discriminatory enforcement. It is true that if the administrators of a regulation enforce it in bad faith or in a manner which unreasonably discriminates, the defendant may seek to enjoin enforcement on constitutional grounds. See People v. Utica Daw's Drug Co., 16 A. D.2d 12, 225 N.Y.S.2d 128 (1962); People v. Walker, 14 N.Y.2d 901, 252 N.Y. S.2d 96, 200 N.E.2d 779 (1964). But here plaintiffs do not seek to enjoin the mere discriminatory enforcement of a valid regulation. Rather, in asking for a three-judge court they contend that the regulation must necessarily result in discriminatory enforcement, and they seek to enjoin all enforcement. Yet nothing on the face of the regulation indicates that it is more likely to result in discriminatory enforcement than any law. Enforcement of Ag 122 turns solely on whether a person has attempted to involve another in a chain distributor scheme. No other distinctions are suggested. To distinguish between those who "promote, offer or grant participation in" the schemes and those who, though otherwise involved in the schemes do not, does not appear to be unreasonable. See Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). Plaintiffs' contention does not merit a three-judge court.
For the reasons stated above,
It is hereby ordered that plaintiffs' motion for a three-judge court be and it hereby is denied.
It is further ordered that this action be and it hereby is dismissed.
NOTES
[1] Justice Douglas would depart from past authority and afford commercial expression the protection of the First Amendment. See his concurring opinion in Cammarano v. United States, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959), and his dissent in Dun & Bradstreet, Inc. v. Grove, Trustee et al., 404 U.S. 898, 904, 92 S.Ct. 204, 30 L.Ed.2d 175 (1971). On occasion lower courts have implied that constitutional protection hinges on whether the commercial expression is "true." See, e. g., L. G. Balfour Co. v. Federal Trade Commission, 442 F.2d 1, 24 (7 Cir., 1971).
[2] By as much as plaintiff overstates the significance of the fact that the unlawful activity takes the form of speech, the often-cited opinion of Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1949), understates its significance in declaring that:

"* * * it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. * * *"
Often using speech to carry out an illegal course of conduct will immunize the speaker from arrest. For instance, a speaker at an unruly public demonstration may know that continuing his speech will cause a breach of the peace, yet even if the state shows that he intended that result, he cannot be convicted of breach of the peace or attempted breach of the peace as long as his speech itself qualifies for constitutional protection. See Bachellar v. Maryland, 397 U.S. 564, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970); Gregory v. Chicago, 391 U.S. 964, 88 S.Ct. 2033, 20 L.Ed.2d 877 (1968); see also Epton v. New York, 390 U.S. 29, 88 S.Ct. 824, 19 L.Ed.2d 808 (1968) (Douglas, J., dissenting). Were the law otherwise, public demonstrations would be a thing of the past.